UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO ANTI-TRAFFICKING COALITION, an Idaho non-profit organization, | Case No. 1:24-cv-00526-REP |
| Plaintiff, | |
| WES SOMERTON, in his official and individual capacity, JESSICA UHRIG, in her official and individual capacity, AMBER MOE, in her official and individual capacity, JENNIFER BEAZER, in her official and individual capacity, RACHEL KASCHMITTER, in her official and individual capacity, JONA JACOBSON, in her official and individual capacity, CLINT LEMIEUX, in his official and individual capacity, and DANA WIEMILLER, in her official and individual capacity, | **MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

Pending before the Court are Plaintiff's Motion for a Preliminary Injunction (Dkt. 4) and Defendants' Motion to Dismiss (Dkt. 29). All parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. (Dkt. 25.) For the reasons set forth below, the Court finds that Plaintiff is not entitled to a preliminary injunction. The Court, accordingly, will deny the motion for preliminary relief, grant Defendants' Motion to Dismiss in part, and reserve ruling on the Motion to Dismiss in part.

## BACKGROUND

Plaintiff Idaho Anti-Trafficking Coalition ("IATC") is an Idaho non-profit organization that provides services to human-trafficking victims. Amended Compl. ¶ 12 (Dkt. 37). Defendant Idaho Council on Domestic Violence and Victim Assistance ("ICDVVA") is a state

agency that funds, promotes, and supports victim services.  Wiemiller Decl. ¶ 3 (Dkt. 22-7).

Among other things, ICDVVA receives grants from the federal government and distributes these

funds to subrecipients in Idaho.  Amended Compl. ¶ 12 (Dkt. 37).  Since 2019, IATC has

received grant funding from ICDVVA.  *Id.* ¶ 22; Wiemiller Decl. ¶ 4 (Dkt. 22-7).

　　　　Almost as long as IATC has received this funding, IATC and its Executive Director

Jennifer Zielinski have been doggedly lodging complaints against another Idaho non-profit that

also provides services to human-trafficking victims – Community Outreach Behavioral Services

("COBS').  *See* Zielinski Decl. ¶ 7-8 (Dkt. 4-25) and Wiemiller Decl. ¶ 6 (Dkt. 22-7).  The

Executive Director of COBS is Paula Barthelmess.  9/23/2024 Letter (Dkt. 4-21).  At one point,

Barthelmess worked under Zielinski as a contractor for IATC.  *See* 1/28/2020 Cease and Desist

Letter (Dkt. 22-10, pp. 15-17).  In January 2020, however, the relationship soured and ended

with IATC terminating its contract with Barthelmess.  *Id.*

　　　　In the following years, Zielinski and other IATC representatives filed or attempted to file

numerous complaints against COBS with various authorities, including the Office of the

Inspector General, the Office of Civil Rights, the police, the Idaho Bureau of Occupational and

Professional Licenses, Optum Idaho, the Idaho Attorney General, the Idaho Tax Commission,

ICDVVA, and at least one Idaho state senator.  Zielinski Decl. ¶ 7-8 (Dkt. 4-25).  In these

complaints, Zielinski accused Barthelmess and COBS, among other things, of committing

Medicaid fraud, stealing IATC's medical records, taking advantage of and mistreating victims,

and sharing victims' information without their consent.  *See generally* Ex. B to Zielinski Decl.

(Dkt. 4-27).  By February 2023, the conflict between IATC and COBS had come to the attention

of the Governor's office.  Somerton Decl. ¶ 4 (Dkt. 22-1).

　　　　On February 28, 2023, ICDVVA's previous Executive Director, Heather Cunningham,

**MEMORANDUM DECISION AND ORDER** – **PAGE 2**

sent an email to IATC and COBS at the request of the Governor's office. *Id.*; *see also* 2/28/2023

Email (Dkt. 22-8). In this email, ICDVVA explained to Zielinski and Barthelmess that it had

"heard from other victim service providers, law enforcement, and other stakeholders that:

- neither of you will be in the same room with the other
- if staff from one of your organizations attends a training staff from the other organization will not attend
- your programs are hosting separate and competing events on the same day each of you 'bad mouths' the other program and its director and expresses distrust of those who work with the other program
- your programs directly compete for limited donations from those concerned about antitrafficking
- if one of your programs works with a stakeholder, the other refuses to do so in most (not all) instances, and
- worst of all, that each organization has taken actions (or failed to take actions) which compromise victim safety[.]"

2/28/2023 Email (Dkt. 22-8). In addition to providing these examples, ICDVAA noted that the

relationship between IATC and COBS had been described to ICDVVA as a "blood feud" that

was "getting out of hand." *Id.* Finally, ICDVVA suggested that mediation could be "helpful"

and indicated that it "may be able to assist by providing names of potential mediators and/or

limited funding for the express purpose of mediation to facilitate better delivery of victim

services." *Id.*

    Zielinski and IATC responded by sending ICDVVA a "formal complaint" about

Cunningham's email. 3/14/2023 Email (Dkt. 22-10).[1]

    When none of these complaints bore fruit, Zielinski took her concerns to the press. In the

Spring of 2024, Zielinski spoke with a reporter (or reporters) at a regional news organization

---

[1] In her declaration, Zielinski refers to this email as a complaint against COBS, but the email that states: "On behalf of the Idaho Anti-Trafficking Coalition Board of Directors and Executive Director, we feel that we must file a formal complaint *regarding Heather's email from February 28 and her follow-up email response.*" 3/14/2023 Email (Dkt. 22-10) (emphasis added).

**MEMORANDUM DECISION AND ORDER** – PAGE 3

called InvestigateWest.  7/1/2024 Email (Dkt. 4-8, p. 4).  Between July 15th and July 31st, 2024, InvestigateWest published a series of four articles about COBS, endorsing many of the complaints Zielinski had lodged against COBS for years.  *See generally* InvestigateWest Articles (Dkts. 4-9 through 4-12).  InvestigateWest also expressed indirect criticism for ICDVVA, writing that "[i]n an unregulated 'wild, wild West' of oversight for safe houses, complaints and concerns about COBS go all but unexamined."  7/15/2024 Article at 20 (Dkt. 4-9).

On July 26, 2024, during the publishing of the InvestigateWest articles, ICDVVA's seven-member Council held its regular meeting to select grant recipients for fiscal year 2025 ("FY25"), which runs from October 1, 2024 through September 30, 2025.  *See* 7/26/2024 Meeting Minutes (admitted as Pl.'s Exhibit 5 at the 2/18/25 Motion Hearing) and 8/7/2024 Letter (Dkt. 4-15).  At this meeting, the Council voted to provide funding to both COBS and IATC.  Wiemiller Decl. ¶¶ 19-20 (Dkt. 22-7).

On August 7, 2024, ICDVVA's then and current Executive Director, Dana Wiemiller, notified IATC of the decision by a "Grant Award Notification" letter.  8/7/2024 Letter (Dkt. 4-15).  This letter explained that (i) IATC's application had scored 39th out of 45 applications, (ii) IATC had been awarded a partial grant of $231,305 for FY25, and (iii) IATC's grant would be funded with Victims of Crime Act ("VOCA") funds.  *Id.* The letter described the steps IATC would need to take to accept the grant, including reviewing and approving the draft budget and signing a subaward agreement.  The letter warned that the subaward agreement was required to be fully executed by October 1, 2024.  *Id.*

The subaward agreement was never executed.  Wiemiller Decl. ¶¶ 23-26 (Dkt. 22-7).  Before the October 1, 2024 deadline, the Council revisited its decision to fund IATC, and after two public sessions, voted not to renew IATC's funding for FY25.  *See* 9/6/2024 Meeting

Minutes (Dkt. 4-18) and 9/20/2024 Meeting Minutes (Dkt. 22-25).  On September 25, 2024,

ICDVVA sent IATC a letter informing it of this decision.  9/25/2024 Letter (Dkt. 4-19).  The

letter asserts that the Council decided not to renew IATC's grant because of its "concerns about

IATC's refusal to collaborate with a variety of community partners, the resulting disruption to

victim services, and the inadequate management/administration of grant funds."  *Id.*

On October 17, 2024, IATC sent ICDVVA a letter contesting the revocation of its grant

funding.  *See* Fall 2024 Email Exchange at 5 (Dkt. 22-4).  On October 25, 2024, ICDVVA

offered to treat IATC's letter as "an appeal of the Council's September 25, 2024 letter, pursuant

to section 6.19" of the ICDVVA's policies and procedures manual.  *Id.* at 3.  IATC immediately

declined this offer.  *Id.* at 2.  IATC's Counsel explained that it believed the appeals process was

not applicable and that "IATC sees no possible benefit in having ICDVVA consider its demand

letter as an appeal given that ICDVVA believes it can circumvent its own scoring and

application review/award process to retaliate against IATC."  *Id.*

This lawsuit followed shortly thereafter.  IATC alleges that ICDVVA's decision to

revoke its FY25 funding was an act of retaliation against IATC for its Executive Director's

exercise of her First Amendment rights.  Amended Compl. ¶ 8 (Dkt. 37).  IATC also alleges that

ICDVVA failed to provide it with appropriate procedural due process before revoking the grant.

*Id.*  On November 13, 2024, Plaintiff filed a motion for preliminary injunction, asking the Court

to reinstate its FY25 grant.  *See* PI Mtn. (Dkt. 4).  Due to stipulated briefing extensions, the

motion did not become ripe until January 14, 2025.  (Dkts. 7, 8, 26, 27, 28.)

Three days later, Defendants filed a motion to dismiss asserting both sovereign and

qualified immunity.  (Dkt. 29.)  On February 10, 2025, the Court granted the motion in part,

dismissing Defendant ICDVVA from the lawsuit.  2/10/2025 MDO (Dkt. 34).  The Court,

however, allowed Plaintiff leave to amend the complaint in order to allege official capacity

claims for injunctive relief against ICDVVA's council members under *Ex Parte Young*.  *Id.*  The

Court explained that it would hear argument on how Defendants' assertion of sovereign

immunity applied to these claims at the upcoming motion hearing and would reserve ruling on

Defendants' assertion of qualified immunity until after the motion for a preliminary injunction

was resolved.  *Id.*

 In accordance with these instructions, the Court held a hearing on February 18, 2025

where it took evidence and heard argument on Plaintiff's motion for preliminary injunction and

Defendants' assertion of sovereign immunity.

## LEGAL STANDARDS

 A preliminary injunction is an extraordinary remedy that is "never awarded as of right."

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Generally speaking, a party

seeking a preliminary injunction must establish (1) a likelihood of success on the merits; (2) a

likelihood of irreparable harm in the absence of preliminary relief; (3) a balancing of equities tips

in favor of preliminary relief; and (4) an injunction is in the public interest.  *Id.* at 20.

 The Ninth Circuit weighs these factors on a sliding scale, such that where there are only

"serious questions going to the merits" a preliminary injunction may still issue so long as "the

balance of hardships tips sharply in the plaintiff's favor" and plaintiff shows that there is a

likelihood of irreparable injury and that the injunction is in the public interest.  *Short v. Brown*,

893 F.3d 671, 675 (9th Cir. 2018).

 A preliminary injunction can take two forms.  The first, a "prohibitory" injunction,

logically "prohibits a party from taking action and preserves the status quo pending a

determination of the action on the merits."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH*

& Co., 571 F.3d 873, 879 (9th Cir. 2009) (quotation marks and citation omitted).  In contrast, a "mandatory" injunction, "goes well beyond simply maintaining the status quo [ ] and is particularly disfavored" because it "orders a responsible party to take action."  *Marlyn Nutraceutical*s, 571 F.3d at 879.

Because a mandatory injunction alters the status quo, the already stringent standard for granting a preliminary injunction is further heightened.  *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden is "doubly demanding" for a mandatory injunction).  A mandatory injunction may not be issued "unless the facts and law clearly favor the moving party."  *Id.*; *see also Marlyn Nutraceuticals*, 571 F.3d at 879 ("In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages."); *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984) (when "a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo," courts should "be extremely cautious").

Given the greater showing required for mandatory injunctions, courts have declined to apply the "serious questions" sliding scale inquiry to that type of requested injunctive relief.  S*ee Doe v. Snyder*, 28 F.4th 103, 111, n.4 (9th Cir. 2022) (for mandatory injunctions, "weakness in a plaintiff's showing of harm cannot be offset by a stronger showing on the merits of the underlying legal claim.") (internal citation omitted); *see also P.P. v. Compton Unified Sch. Dist.*, 135 F. Supp. 3d 1126, 1135 (C.D. Cal. 2015) (same).

Distilled down, under either a prohibitory or mandatory injunction, a plaintiff must satisfy the four *Winter* factors.  If a plaintiff is pursuing a prohibitory injunction, a more relaxed ("likely") and flexible ("serious questions" sliding scale) standard applies.  In comparison, if a

plaintiff is pursuing a mandatory injunction, a stricter ("clearly favors") and more rigid (no "serious questions" sliding scale) standard applies.[2]

## **DISCUSSION**

A. <u>Ex Parte Young</u>

The Eleventh Amendment bars lawsuits from being brought in federal court against a state or its officials. *Franceschi v. Schwartz*, 57 F.3d 828, 831 (9th Cir. 1995) and *Natural Resources Defense Council v. California DOT*, 96 F.3d 420, 421 (9th Cir. 1996). There is a well-known exception, however, for actions seeking prospective declaratory or injunctive relief against state officers in their official capacities. *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002). This exception was first recognized by the Supreme Court in *Ex Parte Young*, 209 U.S. 123 (1908).

To obtain relief under *Ex Parte Young*, as Plaintiff seeks to do here, a plaintiff must: (1) allege, and eventually prove, an ongoing violation of federal law and (2) seek relief properly characterized as prospective. *Verizon*, 535 U.S. at 645 (applying *Ex Parte Young* to a motion to dismiss) and *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 730 (9th Cir. 2022) (applying *Ex Parte Young* at summary judgment).

The parties disagree about whether Plaintiff can satisfy these requirements. For the reasons set forth in detail below, the Court agrees with Defendants that the First Amendment violation Plaintiff asserts is not ongoing within the meaning of Ninth Circuit law. This same law, however, counsels against the dismissal of Plaintiff's procedural due process claim on Eleventh Amendment grounds.

---

[2] The parties disagree about what kind of injunction Plaintiff is seeking. The Court need not address this issue because Plaintiff's motion fails under the more relaxed standard for prohibitory injunctions.

      *i.    Plaintiff has failed to identify any practice, policy, or procedure associated with its First Amendment retaliation claim.*

The *Ex Parte Young* exception is "focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past." *Papasan v. Allain*, 478 U.S. 265, 277-278 (1986). As the facts of this case demonstrate, distinguishing between "ongoing" violations and "past" violations is not always as easy in practice as it is in theory. *See Edelman v. Jordan*, 415 U.S. 651, 667 (1974) (the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex Parte Young* is not a difference of "day and night"); *see also Papasan*, 478 U.S. at 278 (1986) ("For Eleventh Amendment purposes, the line between permitted and prohibited suits will often be indistinct.").

Here, for example, Plaintiff challenges Defendants' decision to revoke Plaintiff's grant funding for a single fiscal year, which began on October 1, 2024 and which ends on September 30, 2025. Is this alleged violation "ongoing" because the grant year is not yet over and Plaintiff is "continuing to be punished for its First Amendment-protected speech?" *See* Pl.'s Rsp. at 3 (Dkt. 21). Or did the alleged violation occur *in the past* when Defendants voted on a "one-time" denial of grant funds for a single grant year? *See* D.'s MTD at 6-7 (Dkt. 29-1).

To help courts resolve such questions, the Ninth Circuit has adopted a "practice, policy, or procedure" test. For a constitutional violation to be considered "ongoing" under Ninth Circuit law, a plaintiff must "identify a practice, policy, or procedure that animates the constitutional violation at issue." *Ariz. Students' Ass'n ("ASA") v. Ariz. Bd. of Regents*, 824 F.3d 858 (9th Cir.

2016); *see also Riley's*, 32 F.4th at 731 (indicating that "evidence of an ongoing constitutional violation" requires proof of a "policy or practice").[3]

Plaintiff has not made this showing.  In the Amended Complaint, Plaintiff alleges that "Defendants have adopted and continue to maintain an interpretation of regulations and policies that has caused and will continue to cause Defendants to make funding decisions in a manner that violates the Plaintiff's First Amendment rights, including but not limited to Defendants' interpretation that 28 CFR § 94.103(a) gives them the authority to make funding decisions *without any limitations*."  Amended Compl. ¶ 143 (Dkt. 37) (emphasis added).  At oral argument, Plaintiff elaborated on this point, accusing Defendants of taking the position that "nothing," not even the Constitution, "overrides" their grant awarding authority.  Plaintiff maintains that this "interpretation" constitutes an ongoing violation of Plaintiff's First Amendment rights.  *Id.* ¶ 144.

The Court agrees with Plaintiff's theory, but not with Plaintiff's characterization of the facts.  If Defendants had issued guidance or had a documented policy saying that they could exercise their discretion over funding decisions without *any* regard for an applicant's constitutional rights, that would be a policy that the Court could enjoin.  *See Riley's*, 32 F.4th at 731 (school district "guidance" qualified as an "ongoing policy").  Similarly, if Defendants had a pattern of exercising their grant awarding authority in a manner that punished applicants for engaging in protected speech, that could rise to the level of an ongoing violation.  *See Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020) (injunctive relief was appropriate where the plaintiffs – a newspaper organization, journalists, and legal

---

[3] At the February 18, 2025 motion hearing, Plaintiff agreed that a "practice, policy, or procedure" requirement applies to its claims for injunctive relief.

**MEMORANDUM DECISION AND ORDER – PAGE 10**

observers – produced "powerful evidence" that the law enforcement defendants had engaged in an "ongoing, sustained pattern" of injuring the press during the protests over the death of George Floyd, including "dozens" of examples of police beating plaintiffs with batons, shooting them with impact munitions, and pepper spraying them).

The problem is that Plaintiff has not alleged any facts, or provided any evidence, to show that Defendants have ever adopted such a fanatical interpretation of their grant award authority. Plaintiff's argument rests entirely on conjecture and conclusory assertions, which the Court is not bound to accept. Specifically, because Defendants have asserted discretion over grant awards[4] and because Defendants *once* exercised that discretion in a manner that raises serious constitutional questions (i.e., when they voted to revoke Plaintiff's FY25 grant), Plaintiff maintains that Defendants must have a silent policy of ignoring First Amendments constraints when making grant decisions. This reasoning stretches the idea of a policy too far.

A single abuse of a state agency's discretion, no matter how frustrating, is not a "practice, policy, or procedure." *See Riley's*, 32 F.4th at 731 (there was a genuine issue of material fact as to whether the plaintiffs continued to suffer from ongoing First Amendment retaliation because

---

[4] In the letter revoking Plaintiff's FY25 funding, ICDVVA explained that it had "sole discretion to determine which organizations will receive [VOCA] funds, and in what amounts." 9/25/2024 Letter (Dkt. 4-19). Plaintiff highlights this language in its Amended Complaint. Amended Compl. ¶ 101 (Dkt. 37). It is not clear to the Court whether Plaintiff believes ICDVVA's invocation of discretion is an express refutation of constitutional constraint. To the extent Plaintiff is making this argument, it is unpersuasive. Assertions of "discretion" are common in the law. A prosecutor may have "sole discretion" over charging decisions, *see Cooper v. Newsom*, 13 F.4th 857, 865 (9th Cir. 2021), a trial judge may have "sole discretion" over sentencing, *see United States v. Nichols*, 464 F.3d 1117, 1120 (9th Cir. 2006), and a prison official may have "sole discretion" over prison placements, *see United States v. Williams*, 65 F.3d 301, 307 (2nd Cir. 1995), without having the right to violate the Constitution. ICDVVA's assertion of discretion is equally innocuous. When ICDVVA wrote that it had "sole discretion" over VOCA awards, it was quoting the relevant regulatory language, not claiming a right to award or deny grants without any regard to grant applicant's constitutional rights. *See* 28 C.F.R. § 94.103(a) (using the term "sole discretion").

**MEMORANDUM DECISION AND ORDER – PAGE 11**

the plaintiffs adduced testimony that school district "guidance" remained in place requesting that no field trips be scheduled at the plaintiffs' farms); *see also L.A. v. Lyons*, 461 U.S. 95, 103-104 (1983) ("a relatively few instances of violations by individual police officers, without any showing of a deliberate policy on behalf of the named defendants, did not provide a basis for equitable relief").

Here, Plaintiff can apply for funding in fiscal year 2026.  D.'s MTD at 6 (Dkt. 29-1).  It can also apply for any supplemental funding that becomes available in fiscal year 2025 and is open for grant applications.  *See* IDAPA 63.05.04.017302 ("[a]pplications for supplemental grants may be submitted for consideration at any time during the effective period of a grant as specified in the program guidelines").  Absent additional acts of retaliation that deny such funding and amount to a "practice, policy, or procedure," retaliation that is as discrete and time limited as the single instance at issue here is not considered "ongoing" under Ninth Circuit law. *Compare R.W. v. Columbia Basin Coll.*, 77 F.4th 1214, 1225 (9th Cir. 2023) (where a nursing student alleged that he was barred from campus indefinitely, removed from his program of study, and subjected to conditions on his potential return that had no stated end date, he adequately alleged an ongoing violation of his constitutional rights, rather than mere ongoing harm from a past violation) *and Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 841 (1997) (*Ex Parte Young* permitted a plaintiff to seek reinstatement of his employment where he alleged "an ongoing policy and the likelihood of future enforcement") with *Collins v. S.F. Unified Sch. Dist.*, 2021 WL 3616775 (N.D. Cal. August 16, 2021) ("While Plaintiff certainly seeks prospective relief in the form of a preliminary injunction to reinstate her as Vice President, the Court is unable to find in her complaint an adequate allegation of an 'ongoing violation of federal law,'" where the resolution that removed her from her job was a discrete action in the past).

In summary, while Plaintiff has raised serious questions about the legality of Defendants' *past* conduct, Plaintiff has not alleged sufficient facts to support a finding of an ongoing First Amendment violation. The Court, accordingly, will dismiss Count Three without prejudice and deny Plaintiff's motion for preliminary injunctive relief on this claim.

In situations such as these, the court normally grants leave to amend. *ASA*, 824 F.3d at 871; *see also DeSoto v. Yellow Freight Sys.*, 957 F.2d 655, 658 (9th Cir. 1992) ("If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.") (internal citation omitted). In this case, however, Plaintiff has already had an opportunity to amend as well as an opportunity to put on evidence showing an ongoing violation. Given these circumstances, the Court will not invite a second amendment as a matter of course. Neither, however, will the Court preclude one entirely. If Plaintiff obtains additional evidence during discovery that would allow it to properly plead a "practice, policy, or procedure" as set forth above, Plaintiff may timely move to amend its complaint to reinstate Count Three.

> ii.    *Ninth Circuit law suggests that a plaintiff may obtain injunctive relief when it alleges that the government has withdrawn a benefit without providing adequate procedural due process.*

Defendants also assert Eleventh Amendment sovereign immunity as a defense to Plaintiff's procedural due process claim. Unfortunately, neither party separately addresses the interaction between this claim and *Ex Parte Young*. This is not the best approach. While the Plaintiff requests the same relief for both claims, the nature of each claim is different and a determination that one of the claims is (or is not) "ongoing" does not dictate a similar determination for the companion claim. *See Papasan*, 478 U.S. at 280-282 (a claim alleging "the

**MEMORANDUM DECISION AND ORDER – PAGE 13**

breach of a continuing obligation to comply with . . . trust obligations" was barred by the Eleventh Amendment because it was essentially a claim for "a not-yet-extinguished liability for a past breach of trust;" but the plaintiffs' closely-related equal protection claim was properly considered "ongoing" because it alleged a present disparity in the distribution by the State of the benefits of the State's school lands).

Here, there is on-point Ninth Circuit law – *K.W. v. Armstrong*, 789 F.3d 962 (9th Cir. 2015) – which warrants different treatment of Plaintiff's procedural due process claim.  The plaintiffs in *K.W.* were developmentally disabled Medicaid recipients whose benefits were reduced when the State of Idaho changed its formula for calculating their individual budgets.  *Id.* at 967-98.  The district court found that the State had not provided the plaintiffs with adequate procedural due process before making the contested budget changes, and the court preliminarily enjoined the relevant state officials from reducing the plaintiffs' benefits until adequate notice had been provided.  *Id.* at 966, 971.

On appeal, the defendants in *K.W.* argued that the reinstatement of the old budget formula violated the Eleventh Amendment by awarding retrospective relief against the state.  *Id.* at 974. The Ninth Circuit disagreed, holding that:

> The classwide injunction grants only prospective relief allowed under the Eleventh Amendment, by restoring class members to the individualized budgets they had prior to the Department's defective 2011 Budget Notice. The injunction does not compensate class members for any loss of services that occurred prior to the date it was entered. Thus, the relief granted is not measured in terms of a past monetary loss.

*Id.*  In *K.W.*, the Ninth Circuit never addressed or discussed the "practice, policy, or procedure" requirement, which comes from more recent Ninth Circuit law and which both parties agree applies here.

**MEMORANDUM DECISION AND ORDER – PAGE 14**

Given this silence, it is not clear to the Court how to square *K.W.* with *Riley's* and *ASA*. The Court can imagine an argument that *K.W.* is distinguishable because it involved an indefinite budget change, whereas this case involves a temporary withdrawal of funding. The Court can also imagine an argument that the defendants in *K.W.* did not challenge the "ongoing" nature of the violation on appeal, so *K.W.* does not speak to this particular issue. The Court, however, is not certain that either of these are the best or most natural reading of *K.W.* Given (i) the similarities between *K.W.* and the allegations presented in this case and (ii) Defendants' failure to address or discuss *K.W.*, the Court believes the best approach is deny Defendants' assertion of sovereign immunity as it relates to Plaintiff's procedural due process claim. The Court will consider Plaintiff's request for preliminary relief on this claim below.

B.  Plaintiff's Likelihood of Success on the Merits

"A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Brewster v. Bd. of Educ.*, 149 F.3d 971, 982 (9th Cir. 1998). Based on the evidence that has been presented, Plaintiff cannot satisfy either element.

i.  *Plaintiff did not have a property interest in a FY25 grant.*

To have a property interest in a government benefit, an organization must have "more than an abstract need or desire for the benefit. [It] must have more than a unilateral expectation of it. [It] must, instead have a legitimate claim of entitlement to it." *Gerhart v. Lake County Mont.*, 637 F.3d 1013, 1019 (9th Cir. 2010) (cleaned up). In the benefits context, this generally requires that the statute or regulations creating the benefit be mandatory in nature. *Id.* For example, "[i]f [a] statute sets out conditions under which the benefit must be granted or if the statute sets out the only conditions under which the benefit may be denied, then the statute creates an entitlement to the benefit sufficient to create a property interest. But if the decision to

**MEMORANDUM DECISION AND ORDER – PAGE 15**

confer a benefit is unconstrained by particularized standards or criteria, no [property interest] exists." *Armstrong v. Reynolds*, 22 F.4th 1058, 1072 (9th Cir. 2022)) (cleaned up).

As these examples illustrate, a property interest "must have its source in positive law," such as "state common law, a statute, or a contract." *Clouser v. Espy*, 42 F.3d 1522, 1540 (9th Cir. 1994); *see also K.W.*, 789 F.3d at 972 ("entitlements are created by 'rules or understandings' from independent sources, such as statutes, regulations, and ordinances") (cleaned up). A reasonable expectation of receiving a benefit, that is untethered to a specific body of law, is not enough. The key inquiry is whether the issuing authority is *required* to award the benefit once an applicant satisfies specific non-discretionary criteria. *Shanks v. Dressel*, 540 F.3d 1082, 1091 (9th Cir. 2008) ("Only if the governing statute compels a result upon compliance with certain criteria, none of which involve the exercise of discretion by the reviewing body, does it create a constitutionally protected property interest.") (citation omitted); *see also Doyle v. City of Medford*, 606 F.3d 667, 673 (9th Cir. 2010) ("a statute may create a property interest if it mandates a benefit when specific non-discretionary factual criteria are met").

Here, it is undisputed that the VOCA regulations gave ICDVVA significant discretion over grant awards. 28 C.F.R. § 94.103(a) (explaining that state administering agencies, like ICDVVA, "have sole discretion" subject to certain program requirements "to determine which organizations will receive funds, and in what amounts"). Plaintiff argues that ICDVVA voluntarily eliminated this discretion through its own regulations. Once again, Plaintiff's overarching legal theory is sound (an agency's regulations can give rise to a property interest), but its interpretation of the specific regulations at issue is wanting.

Plaintiff relies on two features of the Idaho Administrative Code (the "IDAPA") to argue that it had a property interest in a FY25 grant. First, Plaintiff emphasizes that IDAPA

**MEMORANDUM DECISION AND ORDER – PAGE 16**

63.05.04.015.02 requires the Council to review, score, and select eligible grant applications

based on the criteria that are specified in the program guidelines published for that particular

grant.[5]  Nothing in this section, however, requires ICDVVA to award funding to applicants who

meet certain criteria or score above a certain threshold.

As the ICDVVA Grant Administration Policies and Procedures explain, "[t]he Council

will evaluate each application based on reviewer scores, operational risk assessments, and

comments along with other regional factors such as the number and quality of applications

submitted, the VOCA and FVPSA underserved population requirements, subrecipient

compliance with ICDVVA requirements, distribution of funds throughout the state, and other

factors delineated in the IDAPA rules or considered material by ICDVVA staff and/or the

Council, based on best available data."  *See* ICDVVA Policies & Procedures Version: 3.2 at 17

(Dkt. 22-3).  And, after this evaluation, "[t]he Council will determine final funding amounts and

vote to approve final awards."  *Id.*  In other words, the Council has ultimate discretion over

which applicants should receive grants and which should not.  The scoring criteria and scoring

rubric may guide this discretion, but they are not determinative of which *specific* applicants

should receive awards, and do not, consequently, give rise to any property interests.  *See*

*Armstrong*, 22 F.4th at 1076 (laws that "offer the decisionmaker discretionary or indeterminate

grounds for action" do not establish property rights); *see also Allen v. City of Beverly Hills*, 911

F.2d 367 (9th Cir. 1990) (a provision allowing the Beverly Hills City Council to abolish any

---

[5] IDAPA 63.05.04.019.03 explains that the criteria the Council elects to use "may vary with each
funding opportunity" but should generally include consideration of (i) compliance with grant
requirements, (ii) the need for the proposed services in the community, (iii) whether the
applicant's employees and volunteers have adequate training, (iv) plans to address service gaps,
(v) the resourcefulness and efficiency of the applicant, (vi) the stability of the applicant, (vii) the
applicants fiscal responsibility, and (viii) collaboration among programs.

**MEMORANDUM DECISION AND ORDER** – **PAGE 17**

position in the classified service when "necessary in the interests of economy or because the necessity for the position no longer exists" gave the government broad discretion" over layoffs rather than imposing the kind of "particularized standards or criteria" necessary to create a property interest).

      The second feature of the IDAPA that Plaintiff cites to support its procedural due process claim is IDAPA 63.05.04.030.  IDAPA 63.05.04.030 sets forth four situations in which the Council may deny, suspend, or terminate a grant: (i) noncompliance with rule and program guidelines, (ii) criminal misconduct, (iii) disincorporation, and (iv) internal take-over.  Plaintiff argues that this list creates a "for cause" denial scheme setting forth the only conditions under which ICDVVA can deny a grant.  As an initial matter, the Court is not convinced that IDAPA 63.05.04.030 was meant to be exhaustive as opposed to illustrative.[6]

      Even if it was, however, that would not advance Plaintiff's case.  To the extent IDAPA 63.05.04.030 creates a "for cause" termination scheme, the Court agrees with Defendants that it only applies to grant recipients, who have signed grant agreements, not with every single grant applicant, as Plaintiff maintains.  A careful reading of the regulations as a whole makes this clear.  To set the stage, the relevant regulations create a two-step application process.  At step one, "[a]ll applicants must meet eligibility requirements specified in program guidelines for their application to be considered."  IDAPA 63.05.04.015.01.  At step two, the Council reviews and scores all *eligible* applicants and selects which of the *eligible* applicants to fund based on

---

[6] There is another provision of the code, IDAPA 63.05.04.015.05, that addresses "termination of funding."  While it overlaps in part with IDAPA 63.05.04.030, it does not match it entirely.  IDAPA 63.05.04.015.05, for example, notes that the Council may "terminate a grant if the project loses viability or is unlikely to meet the intent of the original application," even though this is not one of the grounds for termination listed in IDAPA 63.05.04.030.  The differences between these two provisions suggests that neither contains an exhaustive list of "for cause" reasons a grant may be terminated or denied.

**MEMORANDUM DECISION AND ORDER – PAGE 18**

detailed program criteria, including regional factors, demand data, and organization information, among other things.  *See* IDAPA 63.05.04.015.02; *see also* ICDVVA Policies & Procedures Version: 3.2 at 17-18 (Dkt. 22-3).

Plaintiff's reading of IDAPA 63.05.04.030 makes a hash of this process.  According to Plaintiff, IDAPA 63.05.04.030 requires ICDVVA to award funding, in "some amount," to every applicant who meets the most basic program requirements and is not acting illegally.  Pl.'s Reply at 8 (Dkt. 28) (explaining that IDAPA 63.05.04.030 creates "an entitlement to some amount of funding—not a specific amount of funding").  In other words, Plaintiff believes that IDAPA 63.05.04.030 requires the Council to provide applicants that are geographically redundant, less inefficient than other applicants, or otherwise not a wise monetary choice *according to the detailed program criteria ICDVVA is required to consider* with "some amount of funding," even if it is only a dollar.

Such a limitation serves no purpose and is not required by the plain language of IDAPA 63.05.04.030.  And, it stands in direct tension with ICDVVA's responsibility to *select* grant recipients based on various fact-attentive program criteria, not just award grants to everyone who is eligible.  IDAPA 63.05.04.015.02.

In short, the regulations and program guidelines are clear that no particular grant applicant is ever entitled to funding, no matter how handily that applicant clears the eligibility requirements or how well that applicant scores on the relevant scoring rubric.

But a grant applicant is what Plaintiff was when ICDVVA pulled its FY25 funding.  As Defendants emphasize, Plaintiff never entered into an agreement with ICDVVA for FY25 grant funding.  While the Council originally voted to award funding to Plaintiff for FY25 and sent Plaintiff a letter notifying it of this offer, Plaintiff does not argue that this award letter gave it any

**MEMORANDUM DECISION AND ORDER** – **PAGE 19**

state law interests in a grant, beyond what other grant applicants enjoy. Nor would such an argument be successful. IDAPA 63.05.04.015.03 clearly requires "[a]ll applicants selected for grant funding" to "enter into a written grant or subgrant agreement setting forth the terms of their grant." Consistent with this provision, the award letter indicates that the offer being extended was still in draft form and that Plaintiff would need to review the proposed budget and sign and return the subaward agreement before the grant became final. 8/7/2024 Letter (Dkt. 4-15).

The Court is sympathetic to the distress and frustration Plaintiff must have experienced when ICDVVA voted to withdraw its offer of grant funding at the last minute. Frustration that the government has backed out of a contract before it was finalized, however, does not rise to the level of a property interest. To prevail on a procedural due process claim, a plaintiff must show a property interest tethered to positive state law. Because Plaintiff has not done this, its due process claim fails.

> ii.    *ICDVVA provided Plaintiff with an opportunity to be heard before its funding was terminated.*

Plaintiff's procedural due process claim also fails on the second element. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). These are "flexible" concepts; the level of procedural protections that the constitution requires will vary based on the particular situation. *Id.* at 334.

Here, Plaintiff argues that the Court should grant it preliminary relief because ICDVVA failed to provide it with even the most rudimentary notice or hearing before revoking its funding. The evidence does not support this claim. When ICDVVA revoked Plaintiff's FY25 funding, it notified Plaintiff of that decision by letter and extended Plaintiff's FY24 funding for an

additional month.  9/25/2024 Letter (Dkt. 4-19).  This funding extension gave Plaintiff a month-long cushion during which to contest the revocation of the FY25 grant.  *Id.*

   Plaintiff made good use of the period, by hiring an attorney and sending ICDVVA a demand letter.  *See* Fall 2024 Email Exchange (Dkt. 22-4).  Relevant here, ICDVVA offered to treat this letter as an appeal of the grant denial under the appeal provisions of its policy manual.  *Id.* at 3.  In other words, ICDVVA provided Plaintiff an opportunity to heard about its loss of funding before that funding had expired.  Plaintiff does not dispute that this process would normally be sufficient to provide grant applicants with any due process to which they are entitled.  Instead, Plaintiff argues that an appeal under ICDVVA's program guidelines was not sufficient here because the guidelines did not allow it to raise First Amendment arguments in its appeal.  The Court disagrees.

   The relevant portion of the policy manual states:

   Unsuccessful applicants will be afforded a reasonable opportunity to appeal to the ICDVVA Council; appeals must be submitted in writing within thirty (30) days of notice of denial and must contain the basis of the appeal. In deciding any appeal, the Council must consider only the information from the applicant provided in the application and other information available to the Council during the scoring and application review/award process to determine whether there is any basis to reverse the decision made.

ICDVVA Policies & Procedures Version: 3.2 at 17 (Dkt. 22-3).  This provision limits the evidence that can be considered on appeal to the evidence that was available to the Council at the time the grant revocation decision was made.  But it is exactly this evidence that Plaintiff relies on to make its First Amendment claim.  Namely, all of Ms. Zielinski's at-issue expressions to InvestigateWest, and publication thereof, occurred prior to IDCVVA's grant revocation decision, and thus, could have been presented on appeal.  In other words, Plaintiff could have made the same arguments it makes here in an appeal to the Council.  The fact that Plaintiff did not

anticipate prevailing in this appeal or did not believe the Council would be receptive to these arguments does not mean its procedural due process rights were violated.

## **ORDER**

IT IS HEREBY ORDERED that:

1. Plaintiff's Motion for a Preliminary Injunction (Dkt. 4) is DENIED.

2. Defendants' Motion to Dismiss (Dkt. 29) is GRANTED in part as follows:

   a. Count Three of Plaintiff's Complaint is dismissed without prejudice.

   b. If Plaintiff obtains additional evidence during discovery showing that Defendants had a policy, practice, or procedure of violating grant recipients First Amendment rights, Plaintiff may move to amend the Complaint to reinstate Count Three.

3. The Court reserves ruling on the individual Defendants' assertion of qualified immunity. The Court will issue a separate ruling on the validity of Counts One, Two, and Four. Defendants shall wait to file an answer or other response to Plaintiff's Amended Complaint until this ruling issues.

DATED: March 03, 2025

Raymond E. Patricco
Chief U.S. Magistrate Judge