UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO ANTI-TRAFFICKING COALITION, an Idaho non-profit organization, | Case No. 1:24-cv-00526-REP |
| Plaintiff, | |
| WES SOMERTON, in his official and individual capacity, JESSICA UHRIG, in her official and individual capacity, AMBER MOE, in her official and individual capacity, JENNIFER BEAZER, in her official and individual capacity, RACHEL KASCHMITTER, in her official and individual capacity, JONA JACOBSON, in her official and individual capacity, CLINT LEMIEUX, in his official and individual capacity, and DANA WIEMILLER, in her official and individual capacity, | **MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

Pending before the Court is the portion of Defendants' Motion to Dismiss (Dkt. 29) that asserts qualified immunity. All parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. (Dkt. 25.) For the reasons set forth below, Plaintiff has alleged a viable First Amendment claim that may proceed to discovery. Plaintiff's procedural due process claim, however, fails as a matter of law and the Court will dismiss it with prejudice.

## BACKGROUND

Plaintiff Idaho Anti-Trafficking Coalition ("IATC") is an Idaho non-profit organization that provides services to human-trafficking victims. Amended Compl. ¶ 12 (Dkt. 37). The defendants who remain in the lawsuit are (i) the seven council members who make decisions for the Idaho Council on Domestic Violence and Victim Assistance ("ICDVVA") and (ii)

**MEMORANDUM DECISION AND ORDER – PAGE 1**

ICDVVA's Executive Director Dana Wiemiller. *Id.* ¶¶ 13-19, 21, 40. Among other things, ICDVVA receives grants from the federal government and distributes these funds to subrecipients in Idaho. *Id.* ¶ 12. Since 2019, IATC has received grant funding from ICDVVA. *Id.* ¶ 22.

This lawsuit arises out of Defendants' decision to revoke an offer of grant funding to Plaintiff for fiscal year 2025. *Id.* ¶¶ 1-8.

The events that gave rise to this decision have their roots in IATC's long-running condemnation of another non-profit, named Idaho Community Outreach Behavioral Services ("COBS"), that also provides services to human-trafficking victims. *Id.* ¶¶ 1-8, 32-34. Almost as long as IATC has received funding from ICDVVA, IATC and its Executive Director Jennifer Zielinski have been doggedly lodging complaints against COBS and its Executive Director Paula Barthelmess. These complaints have accused COBS, among other things, of requiring victims to do unpaid work, publicly disclosing confidential information about trafficking victims, and engaging in fraudulent billing practices. *Id.* ¶¶ 33-34, 38.

These complaints came to a head in the Spring of 2024, after Zielinski shared her concerns with a regional news organization called InvestigateWest. *Id.* ¶¶ 1-8, 38, 48. ICDVVA was first clued into these communications in April or May of 2024, when InvestigateWest reached out to ICDVVA with a public records request. *Id.* ¶¶ 40-41. Not long thereafter, ICDVVA's Executive Director and council members "began suspecting" that Zielinski "had been providing negative information to InvestigateWest about ICDVVA." *Id.* ¶ 45. On June 18, 2024, ICDVVA's Vice Chair Jessica Uhrig sent an email to IATC's Board chair asking for a meeting. *Id.* ¶ 46.

According to the Amended Complaint, at this meeting, ICDVVA's Chair Wes Somerton

and ICDVVA's Vice Chair Jessica Uhrig "spoke with IATC board members about Ms. Zielinski's involvement with the InvestigateWest reporter."  As part of this conversation, Somerton "requested that the IATC board members to ask Ms. Zielinski to stop 'bad-mouthing' ICDVVA to the InvestigateWest reporter."  *Id.* ¶ 47.

Between July 15 and July 31, 2024, InvestigateWest published a series of four articles, endorsing many of the complaints Zielinski had lodged against COBS for years.  *Id.* ¶¶ 3, 33, 55, 68.  One of the four articles "expressed criticism" of ICDVVA for its role in funding COBS despite complaints from victims and from IATC.  *Id.* ¶ 3.  This article reported that Zielinski "believed" that nothing came of IATC's prior complaints because ICDVVA thought they were "part of an ongoing rift between two anti-trafficking organizations."  *Id.* ¶¶ 3, 38.

On August 7, 2024, after the articles were published, ICDVVA sent IATC a letter announcing that it was awarding IATC a grant of $231,305 for fiscal year 2025 ("FY25"), which runs from October 1, 2024 through September 30, 2025.  *Id.* ¶ 81.  The following day InvestigateWest sent ICDVVA another public records request, asking for all "[e]mails and text messages from April 23, 2024, to or from Dana Wiemiller until present day that contain these keywords: 'COBS' 'Paula' 'InvestigateWest' 'Investigate West' or links with the domain.'"  *Id.* ¶ 82.

Approximately one month later, on September 6, 2024, ICDVVA held a special council meeting in order to discuss whether ICDVVA should reconsider the FY25 funding offers it had recently extended to COBS and IATC.  *Id.* ¶¶ 86-94.  At this meeting, ICDVVA's Executive Director explained that she put both organizations on the agenda because "they're connected. And, so I think it's important if we're having a conversation about funding for the one agency based on all of these, you know, the articles and allegations, that it's, you know, on the flipside

we need to have a conversation about the other agency and, again, what we have observed, the information we have received, what our own direct experience has been, again, to have a conversation about this and for the council to, you know, consider how we go forward." *Id.* ¶ 93. At the end of the special meeting, ICDVVA's council tabled its funding decisions and placed both matters on the agenda for the next meeting. *Id.* ¶ 95.

On September 20, 2024, ICDVVA voted to revoke IATC's FY25 grant. *Id.* ¶ 99. Five days later, on September 25, 2024, ICDVVA sent IATC a letter informing it of this decision. *Id.* ¶ 101. The letter asserts that the Council decided not to renew IATC's grant because of its "concerns about IATC's refusal to collaborate with a variety of community partners, the resulting disruption to victim services, and the inadequate management/administration of grant funds." *Id.* This lawsuit followed.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When evaluating a Rule 12(b)(6) motion, the court accepts as true all well-pleaded factual allegations in the complaint, disregarding any unsupported legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Next, having identified the adequately pleaded facts, the court "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Stated concisely, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678.

Dismissal under this standard can be predicated on either (a) "a lack of cognizable legal theory" or (b) "the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008).

**MEMORANDUM DECISION AND ORDER** – **PAGE 4**

Where the sufficiency of the facts is challenged, the plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. If a plaintiff cannot nudge the claims "across the line from conceivable to plausible," the complaint must be dismissed. *Id.* at 680.

## QUALIFIED IMMUNITY

Qualified immunity shields government officials from liability for harm caused by reasonable mistakes, protecting all but the "plainly incompetent or those who knowingly violate the law." *Easley v. City of Riverside*, 890 F.3d 851, 856 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). The qualified immunity inquiry involves two steps. When a defendant asserts qualified immunity, the Court must evaluate: (1) whether the defendant violated a constitutional right, and (2) whether the constitutional right was clearly established at the time of the defendant's conduct, i.e., whether the contours of the right were sufficiently well developed that a reasonable official should have known his conduct was unlawful. *Id.* Unless the answer to both questions is "yes," the defendant is entitled to immunity. *Id.*

A defendant may raise qualified immunity in a motion to dismiss. *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) (discussing the standard of review for qualified immunity on a motion to dismiss). In assessing such a motion, the Court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Id.* If the operative complaint "contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then [the plaintiff is] entitled to go forward" with that claim. *Id.* (internal citation omitted).

The Court maintains the discretion to address either prong of the qualified immunity analysis first. *Easley*, 890 F.3d at 856.

**<u>DISCUSSION</u>**

A. <u>Plaintiff's First Amendment Claim</u>

     *i.    The Pickering Balancing Test*

Defendants assert qualified immunity as a defense to Plaintiff's First Amendment retaliation claim. In order to assess the validity of this defense, the Court must first identify the elements of the claim. Plaintiff argues that the claim has three, and only three, elements: "(1) [Plaintiff] engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." Pl.'s Rsp. at 9 (Dkt. 32) (internal citations omitted). This is a vast oversimplification of First Amendment law in the government funding context.

    When it comes to government funding and contracts, the government enjoys wide discretion over award distribution. For example, it is well-settled that the government may attach speech restrictions to grants, as long as these restrictions serve to "define the limits of the government spending program" by specifying those activities Congress wants to subsidize. *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215 (2013). Similarly, the government may impose speech-related restrictions on public contractors that would be plainly unconstitutional if applied to the public, for instance, firing contractors for being rude to customers. *See Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 676 (1996) (the scope of a government contractor's First Amendment rights depends upon the balance between the interests of the contractor, as a citizen, and the interests of the State, as the employer, in promoting the efficiency of public services).

**MEMORANDUM DECISION AND ORDER – PAGE 6**

These cases recognize that the government may take speech into account when awarding government contracts or grants. The government's power to punish contractors or grantees for their speech, however, is not "unbridled." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 720 (9th Cir. 2022).

In *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), the Supreme Court articulated a framework for analyzing First Amendment claims in the employment context. This is often called the *Pickering* balancing test. The Ninth Circuit has extended this test to "a range of situations where 'the relationship between the parties is analogous to that between an employer and employee' and 'the rationale for balancing the government's interests in efficient performance of public services against public employees' speech rights applies.'" *Riley's*, 32 F.4th at 720 (quoting *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1101 (9th Cir. 2011). In *Riley's*, for example, the Ninth Circuit applied *Pickering* to a farm that hosted public school field trips. *Id.* at 722. In a similar vein, *Clairmont* held that *Pickering* governed a claim by a domestic violence counselor who was employed by a private company that performed counseling services for a municipal court. *Clairmont*, 632 F.3d at 1101-02. Finally, in *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917 (9th Cir. 2004), the Ninth Circuit applied *Pickering* to a business vendor who contracted with a county to "provide insulation and other energy-saving weatherization services for the homes of low-income residents." *Id.* at 921, 923. In all of these cases, as here, the governmental defendant directly or indirectly contracted with the plaintiff to provide services on behalf of the defendant.

The cases where the Ninth Circuit has refused to apply *Pickering*, by contrast, have involved licensing or permitting schemes. *See, e.g.*, *CarePartners, LLC v. Lashway*, 545 F.3d 867, 881-82 (9th Cir. 2008) (explaining that *Pickering* does not apply to regulated entities) and

*Soranno's Gasco v. Morgan*, 874 F.2d 1310 (9th Cir. 1989) (analyzing a First Amendment

retaliation challenge to the suspension of government permits without reference to *Pickering*).

The thrust of this case law is clear – *Pickering* applies to entities, like Plaintiff, who enter

contracts with the government to provide services to the public.  Plaintiff's arguments to the

contrary do not hold water.  As best the Court can tell, Plaintiff is arguing that its relationship

with ICDVVA is not "akin" to an employer-employee relationship because (i) Plaintiff is not

performing government services, (ii) ICDVVA did not monitor Plaintiff intensively, and (iii) the

funds ICDVVA provides to Plaintiff only make up part of Plaintiff's budget.  Pl.'s Suppl. At 3-4

(Dkt. 40).[1]  In all of these regards, however, Plaintiff is exactly like an independent contractor,

and not a mere licensee.

First and foremost, prior to Defendants' alleged retaliation, Plaintiff had a contractual

relationship with ICDVVA wherein ICDVVA reimbursed Plaintiff for providing various services

to crime victims.  Amended Compl. ¶¶ 22, 101, 145-146 (Dkt. 37); *see also* IDAPA

63.05.04.015.03 (all applicants who receive grant funding from ICDVVA must enter into written

agreements with ICDVVA).  The Ninth Circuit has routinely applied *Pickering* to analogous

relationships.  *See Alpha Energy*, 381 F.3d at 923 (plaintiff contracted with the government to

---

[1] In making these points, Plaintiff relies on a few facts that are not contained within the Amended
Complaint.  These facts, however, are undisputed.  And both sides have had ample opportunity
to submit evidence to the Court regarding Plaintiff's First Amendment claim.  The Court,
consequently, will consider the evidence Plaintiff cites when determining whether *Pickering*
applies to Plaintiff's First Amendment claim.  In this <u>limited</u> regard, the Court converts
Defendants' motion to dismiss to a motion for summary judgment.  *See* Fed. R. Civ. P. 12(d)
(allowing the Court to convert a motion to dismiss to a motion for summary judgment).  The
Court notes that purpose of this conversion is to allow the Court to address Plaintiff's arguments
in their most robust form.  In other words, the purpose of the conversion is to give Plaintiff the
benefit of the evidentiary development that occurred as result of the litigation over Plaintiff's
motion for preliminary injunction.  If the Court had limited its attention to the evidence that can
traditionally be considered on a motion to dismiss, that would not have changed its ruling about
the applicability of *Pickering*.

provide weatherization services to low income-residents) and *Clairmont*, 632 F.3d at 1102

(plaintiff worked as a counselor for an "independent contractor" that provided domestic violence

prevention treatment programs to convicted defendants).  The services that ICDVVA funds are

no less governmental in nature.  *See* 34 U.S.C. § 20103(c) and 28 C.F.R. § 94.116 (explaining

that VOCA funding is only available for certain, specified activities, all of which support the

provision of services to crime victims).

Second, like all of the cases where the Ninth Circuit has applied *Pickering*, ICDVVA had

a strong interest in ensuring the services performed by Plaintiff under its contract were "properly

provided."  *See Riley's*, 32 F.4th at 722 (a school district had an interest ensuring that a farm that

hosted school field trips kept students safe and met curricular design goals) and *Clairmont*, 632

F.3d at 1102 (a municipal court had an interest in reviewing the work of a program that was

authorized by the court to provide court-ordered domestic violence treatment).  Here, ICDVVA

had a statutorily mandated duty to "assess, review and monitor" the services Plaintiff was

providing to crime victims with government funds.  I.C. § 39-5208(5); *see also* IDAPA

63.05.04.020.02 (requiring the council to "regularly monitor" funded programs).  This

monitoring had many purposes, including guaranteeing compliance with program guidelines,

"assur[ing] nonduplication of services," and "encourag[ing] efficient and coordinated use of

resources in the provision of services."  I.C. § 39-5208(6) and IDAPA 63.05.04.020.  In other

words, ICDVVA had an interest in ensuring that Plaintiff was providing qualifying services to

victims and that these services were being providing in an efficient, efficacious, non-

discriminatory, and confidential manner.[2]  To protect these interests, ICDVVA was required to

---

[2] In an attempt to downplay these interests, Plaintiff argues that ICDVVA "does not dictate what
services . . . funded organizaitons provide" or ensure that these services are provided to
ICDVVA's satisifcation.  Pl.'s Suppl. at 4 (Dkt. 40).  Instead, Plaintiff insists that "[f]unded
organizaitons tell ICDVVA how they plan to utilize the federal funding that ICDVVA

evaluate Plaintiff's performance "at least every two (2) years," but had discretion to engage in more frequent monitoring. *See* IDAPA 63.05.04.020; *see also* ICDVVA Policies & Procedures Version: 3.2 at 36-39 (Dkt. 22-3).

ICDVVA did not forfeit this interest by only providing IATC with partial funding. Without citing to any legal authority, Plaintiff asserts that a contractual relationship with the government cannot be "analogous to that of an employer-employee" if the contract does not "contemplate anything other than the employer paying the full amount for the services provided by the employee/independent contractor." Pl.'s Suppl. at 4 (Dkt. 40). This argument runs directly counter to Ninth Circuit law. The Ninth Circuit has applied *Pickering* to individuals or organizations that provide services for a governmental entity, even where the government pays nothing for the services. *See Hyland v. Wonder*, 117 F.3d 405, 411 (9th Cir. 1997) (applying *Pickering* to a claim by a volunteer probation officer) and *Clairmont*, 632 F.3d at 1098, 1101 (an organization that contracted with a municipal court to provide domestic violence prevention treatment was governed by *Pickering* even though the organization was paid directly by the defendants who participated in the organization's treatment program and the organization did not receive *any* funding from the court). In addition, it is well-settled that *Pickering* applies to independent contractors who frequently perform the same or similar work for both private and governmental clients. *See Alpha Energy*, 381 F.3d at 923 ("When a business vendor operates

---

administers." *Id.* This argument ignores the significant discretion ICDVVA enjoys when selecting grant applicants. As outlined in the Court's March 3, 2025 decision, ICDVVA bears ultimate responsibility for selecting which of the eligible grant applicants to fund each year based on detailed program criteria, including regional factors, demand data, and organization information, among other things. *See* IDAPA 63.05.04.015.02; *see also* ICDVVA Policies & Procedures Version: 3.2 at 17-18 (Dkt. 22-3). In this regard, ICVVA acts in the role of an employer, first by choosing which projects it will fund and then by entering into written contracts with project operators governing which services ICDVVA will reimburse.

**MEMORANDUM DECISION AND ORDER – PAGE 10**

under a contract with a public agency, we analyze its First Amendment retaliation claim under §

1983 using the same basic approach that we would use if the claim had been raised by an

employee of the agency."); *see also Riley's*, 32 F.4th at 722.  The Court sees no reason to treat

non-profits differently.  Like other independent contractors, a non-profit may provide services to

the public on behalf of one governmental entity while also doing the same or similar work on

behalf of private donors or other, completely distinct governmental entities.

In summary, in every domain that matters, Plaintiff's relationship is much more like

those of the service providers in *Clairmont, Riley's*, and *Alpha Energy* than that of the regulated

entities in *CarePartners* and *Soranno's Gasco,* which did not receive any government funding,

did not have government contracts, and did not voluntarily choose to work with the government,

as Plaintiff did here.  *Compare Clairmont*, 632 F.3d at 1098, 1101 with *CarePartners*, 545 F.3d

at 882.  The Court, accordingly, will assess the viability of Plaintiff's First Amendment claim

under the *Pickering* framework.

ii.    *Factual Plausibility*

Under the *Pickering* framework, government contractors, like Plaintiff, "have First

Amendment rights to speak out on matters of public interest and concern, so long as the speech

does not interfere with the legitimate and orderly administration of government operations."  *See*

*Ohlson v. Brady*, 9 F.4th 1156, 1157-1158 (9th Cir. 2021); *see also Umbehr*, 518 U.S. at 684

(recognizing that independent contractors enjoy similar speech rights to government employees).

To balance these competing interests, the Ninth Circuit uses a sequential five-step inquiry.  First,

to make out a prima facie case of First Amendment retaliation in the employment context, a

plaintiff must show that: "(1) [it] spoke on a matter of public concern; (2) [it] spoke as a private

citizen rather than a public employee; and (3) the relevant speech was a substantial or motivating

factor in the adverse employment action." *Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 904-905 (9th Cir. 2021) (cleaned up).  If the plaintiff establishes these elements, "the burden then shifts to the government to show that (4) it had an adequate justification for treating [the plaintiff] differently than other members of the general public; or (5) it would have taken the adverse . . . action even absent the protected speech."  *Id.* (cleaned up).

Defendants argue that Plaintiff has not pleaded sufficient facts to show that Defendants terminated its grant *because of* the various complaints and comments that Plaintiff's Executive Director relayed to InvestigateWest, as required by the third element of the *Pickering* balancing test.  Ds' MTD at 15 (Dkt. 29-1).  The Court disagrees.

The third element of the *Pickering* balancing test requires a plaintiff to show retaliatory motive or intent.  *Riley's*, 32 F.4th at 721; *see also Howard v. City of Coos Bay*, 871 F.3d 1032, 1046 (9th Cir. 2017) and *Koala v. Khosla*, 931 F.3d 887, 905 (9th Cir. 2019).  But it is well-established that motive need not be established through direct evidence.  *Howard*, 871 F.3d at 1046.  Timing can be powerful circumstantial evidence of retaliatory intent.  *Id.* at 1045-1046.  Courts may also consider evidence that the government expressed opposition to the protected speech and evidence that the government's proffered explanations for the adverse action are false or pretextual.  *Id.*

Here, the sequence of events and the comments of ICDVVA council members and staff are more than sufficient to state a plausible claim of retaliatory intent.  According to the Amended Complaint, IATC had been complaining to ICDVVA about COBS for years.  Amended Compl. ¶¶ 33-34 (Dkt. 37).  During this period, ICDVVA continued to fund IATC.  *Id.* ¶ 22.  That abruptly changed, however, in 2024, after IATC's Executive Director spoke with a reporter at InvestigateWest and that reporter published a series of articles that contained

criticisms of COBS and ICDVVA. *Id.* ¶¶ 1-8. This timeline alone would likely be enough for

Plaintiff's First Amendment claim to survive a motion to dismiss challenging the factual

sufficiency of the complaint. *See Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012)

("Because direct evidence of retaliatory intent rarely can be pleaded in a complaint, allegation of

a chronology of events from which retaliation can be inferred is sufficient to survive

dismissal."); *see also Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011) ("Rule 8(a) does not

impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise

a reasonable expectation that discovery will reveal evidence to support the allegations.").

     Plaintiff, however, has alleged additional evidence of retaliatory intent to bolster the

conclusion that the InvestigateWest articles motivated Defendants to terminate the grant offer to

Plaintiff. Specifically:

- Defendants Wes Somerton and Jessica Uhrig asked to meet with IATC in June 2024,
  after they became aware that InvestigateWest may portray ICDVVA negatively in an
  upcoming article. Amended Compl. ¶¶ 40-46 (Dkt. 37). At the meeting, Somerton
  and Uhrig "spoke with IATC board members about Ms. Zielinski's involvement with
  the InvestigateWest reporter" and Somerton allegedly asked the IATC board "to ask
  Ms. Zielinski to stop 'bad-mouthing' ICDVVA to the InvestigateWest reporter." *Id.* ¶
  47.

- After the meeting between ICDVVA and IATC, ICDVVA staff sent several internal
  emails regarding Zielinski, including an email accusing Zielinski of "withholding
  information from her board about her role in generating the InvestigateWest article."
  *Id.* ¶¶ 48-53. Defendant Uhrig was copied on at least some of these emails. *Id.*

- On July 31, 2024, when the fourth InvestigateWest article was published, ICDVVA's

Executive Director sent a copy of the article to Defendants stating, among other things, that it appeared that "the reporters [were] still attempting to smear [ICDVVA] which is unfortunate and concerning." *Id.* ¶ 69.

- On August 1, 2024, Defendant Somerton sent Director Wiemiller an email about the fourth InvestigateWest article. *Id.* ¶ 72. This email appears to allude to Ms. Zielinski, saying "I continue to be disappointed in the reporter's attempt to dig up dirt on ICDVVA. If she has legitimate questions she should our directo (sic), not persons outside our agency. It is disingenuous to listen to the rantings of one person and not provide us with the specifics of the rantings or the name of the complaining person." *Id.* ¶¶ 72-73.

- At the council meeting where Defendants first considered whether to revoke ICDVVA's funding, Director Wiemiller indicated that issues with IATC had been going on for years, but that the relationship had deteriorated "in particular over the last several months with the introduction of reporters into all of this." *Id.* ¶ 91.

Taken together, these comments indicate that upper-level ICDVVA staff and at least some ICDVVA board members were upset by Zielinski's decision to speak with InvestigateWest. It would not be unreasonable for a fact-finder to infer that this hostility infected Defendants'[3] subsequent funding decision.

---

[3] Defendants never ask the Court to separately anayze the claims against each Defendant. And the Court does not believe that such fine parsing is necessary at this stage. The Court notes, however, that in order to obtain damages against each Defendant, Plaintiff will need to show that that Defendant personally participated in the alleged rights deprivation. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Here, the Court has been presented with evidence (that is not in the Amended Complaint) that one of the named Defendants, Amber Moe, voted *against* the revocation of Plaintiff's grant funding. The Court encourages Plaintiff to reassess whether it should be bringing a claim for damages against Defendant Moe in her individual capacity.

**MEMORANDUM DECISION AND ORDER – PAGE 14**

In an attempt to avoid this conclusion, Defendants stress that they initially voted to award Plaintiff funding and that ICDVVA sent Plaintiff an offer of funding on August 7, 2024. *See* Ds' Reply at 8-9 (Dkt. 33). Defendants argue that this timeline "clearly cuts against Plaintiff's claim that the denial was *because* of the investigative reporter's stories." *Id.* at 9. A jury *may* find this argument persuasive. But Plaintiff has equally, if not more, compelling counterpoints. Most notably, by ICDVVA's own account, its decision to reopen the conversation about funding IATC for fiscal year 2025 was *directly* tied to the articles and allegations against COBS. Amended Compl. ¶¶ 86-95 (Dkt. 37). It may be, as Defendants have elsewhere argued, that the COBS allegations prompted an investigation and reassessment that led ICDVVA to revoke IATC's funding for constitutionally permissible reasons. But it is more than plausible, based on the allegations in the Amended Complaint, that Defendants were motivated, at least in part, by their growing irritation with (i) the negative press, (ii) IATC's role in generating this press, and (iii) the perceived disruptions the InvestigateWest articles were causing.

Nothing more is required at this stage of the proceedings. *See Ariz. Students' Ass'n ("ASA") v. Ariz. Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016) ("At the pleading stage, a plaintiff adequately asserts First Amendment retaliation if the complaint alleges plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct."). The Court, accordingly, will not dismiss Plaintiff's First Amendment retaliation claim as factually deficient.[4]

---

[4] In the Reply, Defendants assert that they are disputing "every element" of Plaintiff's First Amendment claim, not just the third element of retaliatory intent. Ds' Reply at 7 (Dkt. 33). The only challenge Defendants have raised to the factual sufficiency of the Complaint, however, relates to Defendants' motivation or intent. *See* Ds' MTD at 15-16 (Dkt. 29-1). That is the only argument the Court addresses here. *See Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1058 (9th Cir. 2023) ("In our adversary system, it is generally up to the parties to decide, within the parameters of the applicable procedural rules, what particular relief they wish to seek, what type

### iii.    Qualified Immunity

Defendants also argue that Plaintiff's First Amendment rights were not clearly established.  The second prong of the qualified immunity analysis shields government officials, like Defendants, from civil liability unless every reasonable official in the defendant's position would have understood that his or her behavior violated the right at issue.  *Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024).  While this does not require a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*

As Defendants emphasize, determining whether a right is "beyond debate" requires a fact-specific consideration of a plaintiff's claim.  *See Riley's*, 32 F.4th at 729 (for the purposes of qualified immunity, "[t]he right to be free from First Amendment retaliation cannot be framed as the general right to be free from retaliation for one's speech.'') (internal citation omitted).  Here, for example, Defendants argue that Plaintiff's First Amendment claim cannot proceed because it was not clearly established that a "grant administering council (such as ICDVVA) violates the First Amendment if it denies grant funding to an organization (such as IATC) because the organization had communicated complaints to an investigative reporter that could reflect negatively on the council."  Ds' Reply at 8 (Dkt. 33).  This framing defines the question facing the Court at the appropriate level of specificity.

It also, however, contains the seeds of its own demise.  It is black letter law that the First Amendment limits how the government may respond to speech that is critical to it.  *See White v. Lee*, 227 F.3d 1214, 1226 (9th Cir. 2000) (criticizing the government is "paradigmatically protected by the First Amendment").  While these protections are more circumscribed in the

---

of motion they wish to present to obtain that relief, and which arguments they wish to make in support.").

**MEMORANDUM DECISION AND ORDER – PAGE 16**

employment context, that does not mean that a governmental entity has free rein to retaliate against an employee or contractor for speaking negatively about it. *See Pickering*, 391 U.S. at 571-572 (holding that the First Amendment precluded the dismissal of a school teacher who was publicly critical of his employer); *see also McKinley v. Eloy*, 705 F.2d 1110, 1112 (9th Cir. 1983) (extending First Amendment protections to a police officer who criticized the city for failing to give officers an annual raise). It is well-settled, under *Pickering*, that criticism is not a valid basis for terminating a government contract, unless (i) the criticism was made as a public contractor, not as a private citizen, (ii) the criticism was not on a matter of public concern, or (iii) the government establishes a *legitimate* countervailing interest that outweighs the contractor's interest in speaking. *See Moser*, 984 F.3d at 904-905 (setting forth the elements of the *Pickering* test).

In this case, Defendants do not ask for qualified immunity on the "private citizen" or "public concern" elements of the *Pickering* balancing test. Instead, Defendants argue that the Court should grant qualified immunity on the balancing component (i.e., the *Pickering* element). *See* Ds' MTD at 17-18 (Dkt 29-1). When a defendant seeks qualified immunity on these grounds, the question the Court must ask is whether the balancing required by *Pickering* "so clearly favored [the plaintiff] that it would have been patently unreasonable for the [government] to conclude that the First Amendment did not protect [its] speech." *Riley's*, 32 F.4th at 729.

This can be a challenging standard for a plaintiff to overcome at summary judgment. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 784 (9th Cir. 2022) ("As the *Pickering* analysis requires a fact-sensitive, context-specific balancing of competing interests, the law regarding public-employee free speech claims will rarely, if ever, be sufficiently clearly established to preclude qualified immunity.") (internal citation omitted). It is much rarer,

**MEMORANDUM DECISION AND ORDER – PAGE 17**

however, for a court to dismiss a complaint on *Pickering* grounds at the motion to dismiss stage. *See Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 (9th Cir. 1997) (acknowledging that "[i]n many cases, factual development is necessary, so the [*Pickering*] balancing cannot be performed on a 12(b)(6) motion").  The reason for discrepancy is simple; Defendants bear the burden of proof on the *Pickering* element at all stages of the case.  A plaintiff's complaint, consequently, need not and frequently does not contain any information about the state's interests.  *Jensen v. Brown*, 131 F.4th 677, 691 (9th Cir. 2025) (explaining that it can be difficult to conduct a *Pickering* balancing on a motion to dismiss because a plaintiff is "unlikely" to plead detailed facts regarding the state's interest).

Here, the facts alleged in the complaint do not favor Defendants.  Plaintiff alleges that its funding offer was revoked because it shared concerns with a reporter about (i) COBS engaging in unethical and fraudulent behavior and (ii) ICDVVA's failure to investigate IATC's complaints about COBS's misconduct.  Speech that reports wrongdoing or corruption lies at the apex of the First Amendment's protections.  *Hufford v. McEnaney*, 249 F.3d 1142, 1149 (9th Cir. 2001) (public employers generally cannot "silenc[e] reports of corruption or potential illegality," even if those reports would disrupt harmony or efficiency in the workplace).  In *Hufford*, for instance, the defendants discharged the plaintiff for reporting that fellow firefighters had downloaded a large cache of hard-core pornographic files onto the fire station's computers.  *Id.* at 1144.  The Ninth Circuit held that the defendants were not entitled to qualified immunity because it was clearly established that they could not punish the plaintiff for "legitimate whistleblowing."  *Id.* at 1150.

Similar reasoning applies here.  Plaintiff alleges that its funding was revoked because it shared information with a reporter about the wrongdoing of an organization that was receiving

government funds.  When the Court constrains its focus to the complaint, the only legitimate interest that Defendants potentially had in silencing this speech is Defendants' belief that the InvestigateWest reporting was causing some unspecified "disruption" in victim services.  "When asserting such an interest, the government 'must demonstrate actual, material and substantial disruption, or reasonable predictions of disruption in the workplace.'"  *Riley's*, 32 F.4th at 725.  An unsubstantiated assertion of disruption is not enough.  *Id.* (claims of disruption must be supported by evidence, not "rank speculation or bald allegation").  In *Riley's*, for example, the Ninth Circuit held that the defendants were entitled to qualified immunity *at summary judgment* because the defendants had introduced evidence that the plaintiff's speech had led to actual parental complaints.  *Id.* at 730.

Here, the complaint contains no facts indicating that there was any actual disruption to victim services.  Nor are there any other facts that would allow the Court to conclude that ICDVVA's legitimate interests in its operations outweighed Plaintiff's right to speak critically about COBS and its use of government funds.

In the absence of such facts, Defendants are not entitled to qualified immunity on a motion to dismiss.  *See Jensen*, 131 F.4th at 695 (declining "to grant state officials qualified immunity where the strength of the state's interest could not be established from the pleadings"); *see also Riley's*, 32 F.4th at 730 (it is clearly established that a "a claim of imagined workplace disruption for which there is no support, cannot outweigh the First Amendment interests of a government employee or contractor") (internal citations omitted).  To hold otherwise would improperly shift Defendants' burden to justify their conduct onto Plaintiff.[5]

---

[5] While it does not involve an assertion of qualified immunity, *Hernandez v. City of Phoenix*, 43 F.4th 966 (9th Cir. 2022) further supports this conclusion.  *Hernandez* involved a police department that disciplined one of its officers for making Facebook posts denigrating Muslims and Islam, in violation of the department's social media policy.  *Id.* at 972.  The defendants in

Because Defendants have not established a legitimate state interest in revoking Plaintiff's grant funding for speaking critically about COBS and ICDVVA, they are not entitled to qualified immunity at this stage of the proceedings.

B.  Plaintiff's Procedural Due Process Claim

Defendants contend that they are entitled to qualified immunity on Plaintiff's procedural due process claim because Plaintiff does not have a constitutionally protected property interest in the grant funding it seeks.  Ds MTD at 12 (Dkt. 29-1).  The Court has already addressed this issue in detail in its decision denying Plaintiff's motion for a preliminary injunction.  3/3/2025 MDO at 15-20 (Dkt. 41).  The only reason to reach a different outcome here would be procedural.  When ruling on Plaintiff's motion for preliminary injunction, the Court was able to consider a range of evidence presented by the parties.  On a motion to dismiss, however, the Court is generally limited to the information contained in the complaint and to those documents which are incorporated by reference.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  That procedural difference does not change the outcome.

The only documents that the Court considered in determining whether Plaintiff had a property interest in a fiscal year 2025 grant were (i) the ICDVVA policies and procedures manual and (ii) ICDVVA's August 7, 2024 grant offer letter.  3/3/2025 MDO at 15-20 (Dkt. 41).  Both of these documents may be considered on a motion to dismiss as they are quoted in the complaint, they form the basis for Plaintiff's procedural due process claim, and their authenticity

---

*Hernandez* moved to dismiss.  On appeal, the Ninth Circuit acknowledged that the plaintiff's speech was of "comparatively low value."  *Id.* at 979.  It, nevertheless declined to conduct a *Pickering* balancing test at the motion-to-dismiss-satge because there was no evidence properly before the Court at that stage regarding "the actual or potential disruptive impact" caused by the plaintiff's unsavory speech.  *Id.*  The same is true here.

has not been questioned.  *See Knievel v. ESPN*, 393 F.3d 1068, 1070 (9th Cir. 2005) (the incorporation by reference doctrine "permits the court to take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading").  The Court, consequently, will dismiss Plaintiff's procedural due process claim on the merits.

## **ORDER**

IT IS HEREBY ORDERED that:

1.  Defendants' Motion to Dismiss (Dkt. 29) is GRANTED in part as follows:

    a.  Plaintiff's procedural due process claim fails as a matter of law.

    b.  Counts Two and Four of Plaintiff's Amended Complaint, accordingly, are dismissed with prejudice.

2.  Defendants' Motion to Dismiss (Dkt. 29) is DENIED in part as follows:

    a.  Plaintiff has alleged sufficient facts in support of its First Amendment claim to survive a qualified immunity defense at this stage of the proceedings.

    b.  Count One of Plaintiff's Amended Complaint, consequently, may proceed to discovery.

DATED: April 14, 2025

Raymond E. Patricco
Chief U.S. Magistrate Judge