RAÚL R. LABRADOR
ATTORNEY GENERAL

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense

DAVID J. MYERS, ISB #6528
MATTHEW L. MAURER, ISB #12575
Deputy Attorneys General
Office of the Attorney General
P. O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
james.craig@ag.idaho.gov
david.myers@ag.idaho.gov
matthew.maurer@ag.idaho.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO ANTI-TRAFFICKING COALITION, an Idaho Non-Profit Organization, and JENNIFER ZIELINSKI, an individual,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>WES SOMERTON, *et al.*,<br><br>*Defendants.* | Case No. 1:24-CV-00526-REP<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

Plaintiffs cannot show a genuine dispute of material fact that their First Amendment rights were violated when the Defendant council members voted to deny them discretionary grant funding. Under the *Pickering* framework, Plaintiffs are unable to make a prima facie showing that the council members retaliated against them for exercising First Amendment protected rights because (1) Plaintiff Zielinski, by her own admission, did not engage in expressive conduct that addressed a matter of public concern, and (2) to the extent there was any expressive conduct, it had no role in the council members' decision to deny grant funding.

Even if Plaintiffs could make a prima facie showing of retaliation, their claim still fails under the *Pickering* framework because the council members' decision to deny grant funding was justified given the disruption to victim services that resulted from Plaintiffs' very public, highly inflammatory conduct. Additionally, there is no genuine dispute as to any material fact that the council members would have denied Plaintiff grant funding regardless of any expressive conduct because Plaintiffs' refusal to collaborate and financial mismanagement warranted the denial. Finally, even if Plaintiffs could establish a genuine dispute of material fact that their First Amendment rights were violated, which they cannot, the council members are entitled to qualified immunity because they did not violate a clearly established right.

**PROCEDURAL BACKGROUND**

Initially, Plaintiff Idaho Anti-Trafficking Coalition ("IATC") sued the Idaho Council on Domestic Violence and Victim Assistance ("ICDVVA"), its seven individual council members, and its executive director (the individual defendants in their official and individual capacities) under 42 U.S.C. § 1983 for First Amendment retaliation and violation of the Fourteenth Amendment Due Process Clause, seeking compensatory and punitive damages, as well as declaratory relief and an injunction to "reinstate Plaintiff's FY25 grant." Dkt. 1 at 26, 28, Prayer

for Relief. IATC also moved for a preliminary injunction. Dkt. 4. Defendants moved to dismiss on grounds of Eleventh Amendment and qualified immunity. Dkt. 29. The Court granted the motion to dismiss as to ICDVVA and as to the official capacity claims for damages, granted leave to file an amended complaint as to official capacity claims for prospective injunctive relief, and reserved ruling on qualified immunity. Dkt. 34 at 5–6. IATC subsequently filed its First Amended Complaint. Dkt. 37.

After an evidentiary hearing, the Court: (a) denied IATC's motion for a preliminary injunction; (b) granted the motion to dismiss as to IATC's claim of ongoing First Amendment retaliation (Count Three); and (c) reserved ruling on qualified immunity and the remaining three counts of the First Amended Complaint. Dkt. 41 at 22. In a later order, the Court granted the motion to dismiss as to IATC's procedural due process claims (Counts Two and Four) but denied it as to the First Amendment retaliation claim (Count One). Dkt. 42.

In August 2025, IATC filed a Second Amended Complaint ("SAC") (Dkt. 54) adding its executive director, Ms. Jennifer Zielinski, as a plaintiff. Discovery in the case closed on November 28, 2025, after thirteen depositions and the production of thousands of documents.

## SUMMARY OF FACTS

Defendants provide a more complete recitation of the facts relevant to their motion for summary judgment in their Statement of Undisputed Facts (SOUF). That Statement is itself abbreviated due to space limitations; in this brief Defendants will simply touch on the highlights. The exhibits attached to the SOUF, of course, present more of the story.

Defendants include the executive director and the seven council members of ICDVVA, who are from each of the seven public health district regions in Idaho, as defined in Idaho Code § 39–408. ICDVVA receives grants from the federal government and in turn, in its discretion, funds

subrecipients (non-profits) in Idaho who provide victim services to victims of domestic violence and other crimes throughout the state. SOUF ¶ 1–2. The victim service programs who receive grant funding work with law enforcement and other community partners to provide housing and other assistance to victims. *Id.* ¶ 4. Prior to September 2024, Plaintiff IATC had been a subrecipient of ICDVVA-administered funds since the beginning of fiscal year ("FY") 2020 (October 2019). *Id.* ¶ 3. Community Outreach Behavioral Services ("COBS") had been a subrecipient since October 2023. *Id.* ¶ 21. All grant subrecipients are required to "collaborate with other victim service providers" and to "promote meaningful and respectful collaboration, coordination and/or co-advocate with other agencies, other nonprofit organizations, and other community partners to promote and enhance victim services and to avoid duplication of effort." *Id.* ¶ 4.

IATC engaged in a years-long campaign against COBS, filing formal and informal complaints with numerous state officials and agencies. *Id.* ¶¶ 7–16. To date, none of those complaints have ever been substantiated, including IATC-assisted client complaints to ICDVVA. *Id.* ¶ 17. Some of IATC's allegations about COBS have been shown to be false, such as the oft-repeated accusation that COBS has operated without a tax exemption. *Id.* ¶ 14. Employees and board members at IATC "never saw any actual evidence to substantiate the allegations" against COBS. *Id.* ¶¶ 15–16.

IATC's animus toward COBS repeatedly disrupted victim services in human trafficking, as described by other agencies and organizations providing victim services, including: instructing IATC staff not to work with the Idaho State Police or the Anti-Trafficking Task Force; "distract[ing] from the ultimate mission of assisting victims; causing confusion, disruption and distraction from the work to focus on victim services; unprofessional behavior at trainings; despite repeated invitations and encouragements, refusing to participate in any committee that COBS was

part of; refus[ing] to work with people or provide services to certain victims simply because they have also worked with" COBS; and telling a victim that an Idaho State Police Detective could not be trusted because she had at times partnered with COBS. *Id.* ¶¶ 18, 34. That Detective reported: "I have not witnessed anything like this in my forty-five years of law enforcement work." *Id.* ¶ 34.

Even before COBS became a subrecipient of ICDVVA's grant funds, IATC's campaign against COBS prompted the governor's office to request ICDVVA to seek a resolution between the two entities. *Id.* ¶ 10. While COBS cooperated with ICDVVA's overture, IATC not only rejected the overture but filed a complaint about it. *Id.* ¶¶ 11–12. IATC similarly rejected ICDVVA's informal board-to-board intervention in June 2024, resulting in disingenuous representations by Ms. Zielinski to IATC's board. *Id.* ¶ 32.

Never a high-scoring candidate for annual grants nor a financially stable subrecipient, IATC exhibited more serious financial problems than ever in FY2024. *Id.* ¶¶ 26–30. IATC submitted fifteen expedited reimbursement requests, whereas nearly all of the roughly forty-three other Victims of Crime Act ("VOCA") grant subrecipients had zero expedited reimbursement requests and no others had more than one request. *Id.* ¶ 26. IATC also submitted eighteen budget adjustment requests, five more than any of the other forty-three VOCA grant subrecipients in Idaho. Most submitted three or fewer *Id.* ¶ 29. The extraordinary volume of these special requests were signs of seriously poor financial management.

ICDVVA repeatedly addressed both the financial issues and IATC's unprofessional responses to ICDVVA's concerns. *Id.* ¶¶ 10–12, 27–28, 30–31. IATC represented in June 2024 that its financial issues had been resolved, but in fact they continued after the June 2024 board-to-board meeting. *Id.* ¶ 33. Ms. Zielinski later lied about what ICDVVA's board members said at the

meeting, saying falsely that they threatened IATC's grant funding unless Ms. Zielinski stopped talking to reporters. *Id.* ¶ 32.

Ms. Zielinski eventually turned her animus against ICDVVA and its executive director, Dana Wiemiller, complaining behind Defendants' backs that Ms. Wiemiller was threatening and retaliatory. *Id.* ¶ 30. ICDVVA was aware of IATC's attacks. *Id.* Even after a mediation initiated by another subrecipient, with which IATC purported to be satisfied, IATC's surreptitious malignment continued, with Ms. Zielinski "accusing Ms. Wiemiller of lying and covering up for 'COBS.'" *Id.*

In spring 2024, ICDVVA became aware of a potential "news" story by InvestigateWest focusing on COBS, which was later published in the summer in a series of four articles. The existence and content of the InvestigateWest "investigation" and July 2024 articles themselves were of minimal concern to Defendants, in part because the allegations raised in the articles were a re-hash of IATC's longstanding unsubstantiated allegations. *Id.* ¶ 19. The articles, however, did further disrupt victim services. *Id.* ¶ 22. The IATC board was seemingly unaware that Ms. Zielinski admitted to IATC staff she coordinated the articles, which were intended to "take down" COBS, and that she attended all InvestigateWest interviews with victims referred by IATC. *Id.* ¶ 20.

ICDVVA monitored COBS nearly continuously during FY 2024, initially because it was a new subrecipient and later because of IATC-facilitated victim complaints and the allegations in the InvestigateWest articles. *Id.* ¶ 23–25. ICDVVA was unable to substantiate IATC's allegations. *Id.* ¶ 25.

On June 7, 2024, IATC timely submitted a grant application to ICDVVA for FY 2025 grant funding. *Id.* ¶ 35. At its July 26, 2024 meeting, ICDVVA discussed and approved or disapproved all grant funding requests for FY 2025. *Id.* ¶ 36. On August 7, 2024, ICDVVA notified IATC that IATC had been awarded grant funding for FY 2025, subject to completion of the various steps

required before the organizations could finalize the grant by executing the as yet nonexistent grant sub-award agreement. *Id.* ¶ 37.

In a series of telephone interviews in early September 2024, ICDVVA staff member Ms. Duque learned about or confirmed several instances of IATC's disruption of victim services from community partners. *Id.* ¶ 39.

At a special council meeting on September 6, 2024, to discuss the grant funding for COBS and IATC, Ms. Duque relayed to the council members what she had been told about both COBS and IATC in the community partner phone calls. *Id.* ¶ 40. The council members attending (Defendants Somerton, Moe, Beazer, Jacobson, Lemieux, and Kaschmitter) discussed the issues at length. Regarding IATC, ICDVVA spent the overwhelming majority of its time on IATC's issues other than the InvestigateWest articles—approximately 67 of 70 total transcript pages. *Id.* ¶ 41. The InvestigateWest articles were mentioned in passing only three times and never as a reason to deny funding to IATC. *Id.* ICDVVA took no action on either funding application at the September 6 meeting. *Id.*

At ICDVVA's quarterly meeting on September 20, 2024, Defendants Somerton, Kaschmitter, and Jacobson voted to not renew IATC's grant funding for FY 2025, while Defendant Moe voted in favor of funding IATC for FY 2025. *Id.* ¶ 42. Defendants Uhrig, Beazer, and Lemieux did not attend the meeting and did not vote on the motion regarding IATC. *Id.* Defendant Wiemiller is not a council member and therefore cannot vote on ICDVVA motions; accordingly, she did not vote on the motion regarding IATC. *Id.* ¶ 43.

On September 26, 2024, ICDVVA notified IATC that ICDVVA had decided not to renew IATC's grant funding for FY 2025, citing IATC's "refusal to collaborate with a variety of community partners" and its "inadequate management/administration of grant funds." *Id.* ¶ 45.

IATC later contested the decision not to renew grant funding via letter dated October 17, 2024. ICDVVA offered to treat the letter as an appeal of the funding decision, but IATC declined that offer. *Id.* ¶ 46.

**LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is required "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party need not file material "*negating* the opponent's claim" but merely bears the burden of "informing the district court of the basis for its motion" and establishing the absence of a genuine issue of material fact. *Id.* at 323 (emphasis in original). The movant may either "negat[e] an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element . . ." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once that burden is met, the non-movant's burden "is not a light one." *Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted). "To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (citations omitted). This evidence must be more than "merely colorable" in support of the non-movant to survive summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

**ARGUMENT**

I.    **Individual Defendants who did not personally participate in the alleged retaliation are entitled to summary judgment.**

To prevail on their 42 U.S.C. § 1983 claim against an individual defendant, Plaintiffs must make "a showing of personal participation in the alleged rights deprivation." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Plaintiffs cannot make this showing as to Defendants Uhrig, Beazer, Lemieux, Moe, or Wiemiller.

Plaintiffs have alleged that "on September 20, 2024, at an ICDVVA council meeting, ICDVVA voted to revoke IATC's FY25 grant it had previously awarded to IATC." SAC ¶ 99; *see also* ¶ 111 (Dkt. 54) (individual Defendants "as the final decision-making authority on behalf of ICDVVA, were acting under the color of law when they determined to retroactively revoke IATC's FY25 grant"). This alleged revocation, Plaintiffs argue, was retaliation for Plaintiff Zielinski's constitutionally protected activity. *Id*. ¶¶ 116–17. But Council members Uhrig, Beazer, and Lemieux did not participate in the relevant vote—they were not even at the meeting on September 20, 2024. Wiemiller Decl. Ex. R. Not having personally participated in the only relevant decision, these three Defendants are not subject to liability under § 1983.

Council member Moe was present at September 20, 2024 Council meeting and did cast a vote on the motion to not renew Plaintiffs' grant, but she voted *against* the motion. SOUF ¶ 42. She too is entitled to summary judgment because she did not personally participate in the alleged constitutional violation—she did not "vote[] to revoke IATC's FY 25 grant."[1]

Finally, Defendant Wiemiller also did not personally participate in the alleged constitutional violation. As ICDVVA Executive Director, Ms. Wiemiller does not vote (and is not authorized to vote) on ICDVVA's funding decisions and therefore did not vote to deny Plaintiffs

---

[1] In its April 14, 2025 Memorandum Decision and Order, Re: Defendants' Motion to Dismiss, the Court encouraged Plaintiff to "reassess whether it should be bringing a claim for damages against Defendant Moe in her individual capacity" given her vote at the September 20, 2024 meeting. (Dkt. 42 at 14 n.3). Despite amending its complaint in the interim, Plaintiffs have not removed Council member Moe as a defendant.

grant funding on September 20, 2024. *Id.* ¶ 43. For this reason, Ms. Wiemiller is also entitled to summary judgment.

## II.    Under the *Pickering* test, Plaintiffs cannot show a genuine dispute of material fact that their First Amendment rights were violated.

This Court has previously ruled that Plaintiffs' First Amendment retaliation claim is properly analyzed under the *Pickering* framework. Dkt. 42 at 7–8. The Court analogized Plaintiffs' position as a grant subrecipient to that of a government contractor, noting that both "have First Amendment rights to speak out on matters of public concern, so long as the speech does not interfere with the legitimate and orderly administration of government operations." *Id.* at 11 (quoting *Ohlson v. Brady*, 9 F.4th 1156, 1157–58 (9th Cir. 2021)).

To make a prima facie case of First Amendment retaliation, Plaintiffs must show "that (1) [they] engaged in expressive conduct that addressed a matter of public concern; (2) the government officials took an adverse action against [them]; and (3) [their] expressive conduct was a substantial or motivating factor for the adverse action." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004) (citation omitted). If the Plaintiffs meet their burden of establishing a prima facie case of retaliation, the "the government officials (and the government itself) can nonetheless escape liability if they demonstrate either that: (a) under the balancing test established by *Pickering,* [391 U.S. 563, 568 (1968)], legitimate administrative interests in promoting efficient service-delivery and avoiding workplace disruption outweigh the contractor's free speech interests; or (b) … they would have taken the same actions in the absence of the contractor's expressive conduct." *Id.*

Plaintiffs' claim fails under the *Pickering* framework because they have failed to show a genuine dispute of material fact that their First Amendment rights were violated—they have failed to make even a prima facia showing of First Amendment retaliation and, even if they could make

a prima facie showing, ICDVVA members' decision to deny Plaintiffs' grant funding was justified by legitimate countervailing interests.

### A. Plaintiffs cannot make a prima facie showing of First Amendment retaliation.

#### 1. Plaintiff Zielinski did not engage in expressive conduct.

Plaintiffs must first show that they engaged in expressive conduct that addressed a matter of public concern. However, by her own description, Plaintiff Zielinski did not engage in expressive conduct, she simply "facilitated in connecting [victims] to InvestigateWest." SOUF ¶ 20. Although the SAC (Dkt. 54) characterized Plaintiff Zielinski as a whistleblower, providing "information about violations of federal funding requirements" to InvestigateWest reporters, SAC ¶¶ 116–17, Plaintiff Zielinski herself specifically disclaims that characterization. She asserts it was not her intent to be a whistleblower. SOUF ¶ 20. She states that she was not part of the investigation for the articles and was not part of the reporters' meetings with victims. *Id*. Thus, her stated purpose was *not* to report violations of law or engage in any other constitutionally protected activity, but to simply do her job—help victims.[2]

---

[2] This argument is based on Plaintiff Zielinski's own explanation about her intent regarding the InvestigateWest articles, as sworn to in her deposition. To outside observers, Plaintiff Zielinski's intent may have appeared different. Namely, the articles seemed to be a continuation—via the press—of Ms. Zielinski's smear campaign against COBS and its executive director, Ms. Paula Barthelmess. According to multiple individuals who have worked with or for IATC and Plaintiff Zielinski over the years, the attacks against Ms. Barthelmess in the InvestigateWest articles mirrored the attacks Plaintiff Zielinski had repeatedly made before. SOUF ¶ 21. Indeed, text messages between Plaintiff Zielinski and members of her IATC staff are revealing. In one of the message threads from May 31, 2024, Plaintiff Zielinski and her staff exchanged texts about Ms. Barthelmess changing her Facebook profile name. Plaintiff Zielinski wrote: "She's going to look guilty before the article even comes out [laughing emoji]." *Id.* ¶ 20. But these duplicitous statements don't change the analysis. It is still undisputed that Plaintiff Zielinski did not engage in expressive conduct either way—either she was simply doing her job by helping victims or continuing her smear campaign against Ms. Barthelmess. Neither explanation makes her a "whistleblower." *See Cavazos*, 400 F. Supp. at 959.

Under Ninth Circuit precedent, "[c]onduct is expressive when an intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Thomas v. City of Beaverton*, 379 F.3d 802, 810 (9th Cir. 2004) (internal quotation and citation omitted). In *Thomas*, the court found the plaintiff's actions to be expressive because the evidence in the record conveyed an intent, albeit implicit, to expose the defendants' illegal activity. *Id.* Here, however, Plaintiff Zielinski's intent was not to act as a whistleblower and expose Defendants' activities, either implicitly or explicitly. Instead, she specifically disclaimed this intent. SOUF ¶ 20. In her words, she simply "facilitated in connecting [victims] to InvestigateWest." *Id.* In this respect, her conduct was more akin to the plaintiff in *Cavazos v. Edgewood Indep. Sch. Dist.*, 400 F. Supp. 2d 948, 961 (W.D. Tex. 2005), aff'd, 210 F. App'x 414 (5th Cir. 2006). There, the court found that the plaintiff's conduct was not expressive because she was "simply doing her job." *Id.* Likewise here, Plaintiff Zielinski, by her own admission, was simply doing her job to ensure victims' voices were heard. SOUF ¶ 20.

## 2. ICDVVA did not deny grant funding because of the InvestigateWest articles.

The third prong that Plaintiffs must meet in order to show a prima facie case of First Amendment retaliation requires them to show that their expressive conduct was a substantial or motivating factor for the adverse action. The evidence is undisputed that any communications Plaintiff Zielinski may have had with InvestigateWest were not a factor, let alone a substantial or motivating factor, in ICDVVA's decision not to grant funding for fiscal year 2025. ICDVVA did not act from any retaliatory motive; they made a difficult professional decision to discontinue IATC's funding because of repeated financial mismanagement and obstinate refusals to collaborate with partners. ICDVVA deliberated over its decision at length in two public, pre-announced meetings. SOUF ¶¶ 40–44. During the first meeting, on September 6, 2024, ICDVVA discussed

funding options for the two anti-trafficking organizations, COBS and IATC, over the course of two and a half hours. And the meeting ended without a final decision because ICDVVA wanted more time to consider options. *Id.* ¶ 41.

During the second meeting, on September 20, 2024, four council members again considered a variety of funding options and ultimately voted, with one council member dissenting, to not renew IATC's grant agreement for fiscal year 2025. *Id.* ¶ 42. Even the dissenting member of ICDVVA, Amber Moe, testified that there were several legitimate reasons for ICDVVA's decision and it had nothing to do with retaliating against IATC or Plaintiff Zielinski for any involvement in the InvestigateWest articles. *Id.*

Even Plaintiffs' own timeline of events shows their allegation of retaliation makes no sense. As early as May or June 2024, according to the Plaintiffs' SAC, ICDVVA was on notice of a forthcoming InvestigateWest article and that the article could portray ICDVVA "negatively." *Id.* ¶ 19. And by at least July 1, 2024, ICDVVA believed that Plaintiff Zielinski was instigating any forthcoming articles. *Id.*

Then in a meeting on July 26, 2024, about ten days after the first three InvestigateWest articles were released, ICDVVA voted to approve IATC's fiscal year 2025 grant funding. *Id.* ¶ 36. ICDVVA approved funding with full knowledge of the content and nature of the InvestigateWest articles—those articles were specifically discussed during the meeting. *Id.* And then on August 7, 2024, ICDVVA sent a letter to notify IATC of its intent to award them grant funding for fiscal year 2025. *Id.* ¶ 37.

Given this timeline, it makes no sense why—with full knowledge of the alleged basis for retaliation (the articles)—ICDVVA would decide to award Plaintiff grant funds only to later go back on that decision, supposedly in retaliation, even though no new information about the articles

had come to light. The answer is simple: ICDVVA did not retaliate and the InvestigateWest articles were not a factor in ICDVVA's later decision to deny IATC grant funding. Rather, ICDVVA's decision to deny grant funding was due to IATC's financial mismanagement and substantiated failure to cooperate with community partners.

**B. Even if Plaintiffs could make a prima facie showing of retaliation, ICDVVA's decision was justified by legitimate countervailing interests.**

If a plaintiff can show a prima facie case of First Amendment retaliation under the *Pickering* analysis, the burden then shifts to the defendant to demonstrate that it took the action because of a legitimate countervailing government interest that outweighed the free speech interests at stake. *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 724–25 (9th Cir. 2022) (cleaned up). "The government may demonstrate such legitimate countervailing interests by providing evidence that a [plaintiff's] expressive conduct disrupted government services provided by the [plaintiff]." *Id.* at 725. To establish such interests, the government may provide evidence of actual disruption or reasonable predictions of disruption. *Id.* "Evidence that actual disruption has already occurred . . . will weigh more heavily against free speech." *Id.* (internal quotation and citation omitted).

Here, the evidence shows that Plaintiff Zielinski's conduct, even if it could be considered "expressive conduct," and specifically her smear campaign against COBS prosecuted through the InvestigateWest articles, caused substantial disruption to victim services and community partners and violated the terms of the grant funding.

**1.    Plaintiff Zielinski's conduct was a media smear campaign.**

Substantial and credible evidence shows that Plaintiff Zielinski's media campaign against COBS caused actual disruption to victim services. "[E]vidence that the media or broader

community has taken an interest in the plaintiff's conduct may also weigh in favor of the government's assertion of disruption." *Riley's*, 32 F.4th at 727 (citation omitted).

The long-running feud Plaintiff Zielinski had against Ms. Barthelmess and COBS is well documented in this case. SOUF ¶ 18. Ms. Holly Hobbs, a former IATC employee, described the feud as an "obsession" of Ms. Zielinski's that seemed to "intensify over time." *Id*. Ms. Hobbs also described how Plaintiff Zielinski would task her with finding "dirt" on Ms. Barthelmess to support Plaintiff Zielinski's various conspiracy theories and allegations of corruption. *Id.*

So, when Plaintiff Zielinski approached InvestigateWest with her various allegations against COBS, she was effectively taking her smear campaign to the press. As shown in Plaintiff Zielinski's private text messages, that was the whole point—to make Ms. Barthelmess "look guilty" with the "article." *Id.* ¶ 20. Indeed, she admitted to Ms. Hobbs that the InvestigateWest article was intended to "take down" Ms. Barthelmess. *Id.*

The predictable result of Plaintiff Zielinski's media campaign against Ms. Barthelmess and COBS was a substantial disruption to the victim services community. *Id.* at 22.

2.   **Evidence from community partners shows actual disruption to victim services.**

Evidence from law enforcement and community partners, who dealt with the aftermath of Plaintiff Zielinski's media campaign, attests to actual and substantial disruption to victim services. Detective Vickie Gooch with the Idaho State Police is one such partner. She explains that she was aware of the longstanding feud Plaintiff Zielinski had against Ms. Barthelmess and COBS and notes that this would often result in disruption to victim services when, for example, IATC would refuse to work with certain victims who had previously worked with COBS, and IATC told a victim Detective Gooch "could not be trusted." *Id.* ¶¶ 22, 34. Detective Gooch describes how, when Plaintiff Zielinski took her smear campaign against COBS to InvestigateWest in the summer of

2024, victim services were further disrupted and the InvestigateWest articles caused a "divide in the law enforcement community" and resulted in "confusion and disarray." *Id.* ¶ 34.

Ms. Cook describes how the InvestigateWest articles exacerbated the disruption to victim services that resulted as Plaintiff Zielinski brought her running feud against Ms. Barthelmess more into the public eye, noting that the articles "created confusion … leaving victims not knowing whom to trust." *Id.*

ICDVVA was well aware of this disruption to victim services, noting that the articles made Plaintiff Zielinski's feud more public. ICDVVA and community partners were caught in the middle of this dispute, causing distraction as attention was directed toward this feud and awa from the mission of assisting victims. *Id.* ¶ 22.

### C. ICDVVA would have denied grant funding regardless of any "expressive conduct" by Plaintiff Zielinski's.

Another way the government can avoid liability under the *Pickering* framework—even when a plaintiff has made a prima facie case of retaliation—is to show that it would have taken the same action absent the plaintiff's expressive conduct. *Alpha Energy Savers*, 381 F.3d at 923. There is no constitutional violation if the government can show it would have reached the same decision absent the protected conduct, even if protected conduct played a part, substantial or otherwise, in motivating the government's action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977).

As argued above, Plaintiff Zielinski's expressive conduct—her InvestigateWest media campaign against COBS—played no factor, let alone a motivating factor, in ICDVVA's decision to deny fiscal year 2025 grant funding. Even assuming the contrary about ICDVVA's motivation, however, ICDVVA would have denied the grant funding regardless of Zielinski's media campaign. As noted in ICDVVA's September 25, 2024 letter to IATC, ICDVVA's denial of grant funding was

based on "IATC's refusal to collaborate with a variety of community partners, the resulting disruption to victim services, and the inadequate management/administration of grant funds." SOUF ¶ 45.

### 1. Non-collaboration and budget issues predated the InvestigateWest articles.

As early as February 2023, IATC's refusal to collaborate with community partners and Plaintiff Zielinski's feud against Ms. Barthelmess were disrupting victim services, such that these issues had come to the attention of the Governor's office. *Id.* ¶ 10. This prompted ICDVVA's previous Executive Director, Heather Cunningham, to send an email to Ms. Zielinski and Ms. Barthelmess, expressing concern about how the "blood feud" between the two women was compromising victim services. *Id.* Ms. Cunningham reiterated ICDVVA's neutral third-party role, and asked Ms. Zielinski and Ms. Barthelmess to consider mediation, even offering to help by referring mediators and funding the effort. *Id.*

Ms. Barthelmess responded to Ms. Cunninham's email by committing to working with Ms. Zielinski and IATC to resolve any issues between IATC and COBS through mediation. *Id.* ¶ 11. Ms. Zielinski, on the other hand, became defensive and responded to the email by lodging a complaint against Ms. Cunningham. *Id.* ¶ 12.

Similarly, IATC's budget issues predated the InvestigateWest articles. Toward the end of fiscal year 2023, IATC began routinely submitting expedited reimbursement requests to ICDVVA, submitting a total of five (5) for that fiscal year and then another fifteen (15) for fiscal year 2024. In contrast, of ICDVVA's other 43 subrecipients there were only three (3) total expedited reimbursement requests. ICDVVA accommodated IATC's requests where possible, but when they became excessive ICDVVA had to start denying them out of respect for its other subrecipients. ICDVVA explained this to IATC in multiple emails, advising them that other subrecipients, who

also provided vital victim services, were in the same position as IATC waiting on the reimbursement process. *Id.* ¶¶ 26–27.

Even after ICDVVA explained to IATC why its expedited reimbursement requests were denied, IATC attempted to circumvent the process and request expedited reimbursement requests directly from the Idaho Department of Health and Welfare (IDHW). When ICDVVA became aware of IATC's attempt to circumvent the process, ICDVVA emailed Ms. Zielinski and again explained why IATC's routine use of expedited reimbursement requests was inappropriate and concerning. In response to this email, Ms. Zielinski became defensive, accusing ICDVVA of targeting and threatening IATC. *Id.* ¶ 28.

## 2. IATC's budget problems were progressively getting worse.

At the same time IATC began submitting routine requests for expedited reimbursements, IATC was also increasingly requesting budget adjustments—a sign of budget mismanagement that increases a subrecipient's risk assessment score on its grant application. Over the course of fiscal year 2024, IATC submitted a total of sixteen budget adjustments, significantly more than any of the other grant subrecipients. Most subrecipients have only a few, if any, budget adjustments throughout the fiscal year. *Id.* ¶ 29.

Despite these concerns about IATC's budget management over the course of fiscal year 2024, ICDVVA still voted, at their meeting on July 26, 2024, to award IATC grant funding for fiscal year 2025. ICDVVA did so, in part, because of a meeting between members of the IATC board and Council members Uhrig and Somerton on June 25, 2024. *Id.* ¶ 31. At that meeting, these budget concerns were discussed, among other things, and IATC's board assured ICDVVA that its funding and budget issues had been fixed. *Id.* ¶ 33.

By the time of ICDVVA's special meeting on September 6, 2024, it was clear that IATC had not, in fact, fixed these budget issues. *Id.* In that meeting, Council member Somerton expressed his disappointment to hear that the budget issues continued, because he was "truly hoping the board had gotten that taken care of," noting that ICDVVA has pointed out to IATC "that if they're not stable enough to go from week to week without having to ask to be put to the front of the reimbursement line, that's not a sustainable program." *Id.*

In sum, IATC's repeated, unresolved budget issues, along with their continued refusal to collaborate with a variety of community partners, *id.* ¶ 34, led ICDVVA to discontinue IATC's grant funding for fiscal year 2025. The InvestigateWest articles played no role in the decision. And even if it had factored in, there is no genuine issue of disputed fact that ICDVVA would have come to the same decision absent Plaintiff Zielinski's media campaign. Thus, Plaintiffs have failed to show a genuine dispute of material fact that their First Amendment rights were violated.

**III.    Council members are entitled to qualified immunity because they did not violate a clearly established right.**

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established . . . rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and internal quotation marks omitted). Under the second prong of the qualified immunity test, the question is whether the right at issue was "clearly established" at the time of the alleged violation. *Id.* at 232. "The question whether a public employee or contractor enjoyed a clearly established right to speak depends on whether the outcome of the *Pickering* balance so clearly favored the plaintiff that it would have been patently unreasonable for the government to conclude that the First Amendment did not protect his speech. *Riley's*, 32 F.4th at 729 (cleaned up).

"Not surprisingly, there will rarely be a case that clearly establishes that the plaintiff is entitled to prevail under the fact-sensitive, context specific balancing required by *Pickering*." *Id.* "The right to be free from First Amendment retaliation cannot be framed as 'the general right to be free from retaliation for one's speech.' Rather, the right must be defined at a more specific level tied to the factual and legal context of a given case." *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 665 (2012)). The framing of the right at issue must be "adequately adjusted to account for the [government's] interests in avoiding disruption to its operations under the *Pickering* test. *Id.* at 729 n.12.

In this case, Plaintiffs have alleged that their grant funding was revoked because Plaintiff Zielinski made complaints—and reached out to a reporter about those complaints—which negatively implicated ICDVVA. Dkt. 54 ¶ 116. But Plaintiff Zielinski's complaints also impacted community partners and resulted in disruption to victim services. Therefore, in determining whether ICDVVA's denial of grant funding violated Plaintiffs' clearly established right, this Court must ask, taking the facts in the light most favorable to Plaintiff, whether it was clearly established in September of 2024 that a grant administering council could not deny discretionary grant funding to a victim services organization because: (a) the organization's executive director helped victims make unsubstantiated complaints against another victim services organization to an investigative reporter, (b) the complaints were indirectly critical of the council, and (c) led to disruption of victim services and confusion among community partners. *See Riley's*, 32 F.4th at 729–30. The Court's answer to this question must be "no." There was at the time no "existing precedent … [that] placed the … constitutional question beyond debate." *See id.* (cleaned up). Indeed, the Defendants are unaware of any such precedent even existing today.

The Ninth Circuit's decision in *Riley's* provides guidance. In that case, a school district cut ties with a business partner after the business partner's principal shareholder posted controversial political statements on his personal social media account. Concerned parents pressured the school district to cut ties with the business partner because of the political statements, and the district did so shortly thereafter. The business partner brought a First Amendment retaliation lawsuit, claiming his social media posts were protected First Amendment activity for which the district could not act against him (namely, severing the business relationship). *Id.* at 716–18. The court found there was a genuine issue as to whether the school district violated the business partner's First Amendment rights but held that qualified immunity applied because it was not clearly established that the "School District's reaction to parental complaints and media attention arising from [the business partner's] tweets was unconstitutional." *Id.* at 730.

Key to the *Riley's* decision was the fact that the government presented facts showing actual disruption to services—not simply a "pretextual fear of a potential disruption" or "a claim of imagined workplace disruption for which there is no support." *Id.* (internal quotation marks omitted). Here the record likewise contains clear evidence of actual disruption to victim services, and the same reasoning applies: the *Pickering* balance does not favor Plaintiffs. The council members had a heightened interest in taking action to prevent disruption of victim services. Thus, even if Plaintiffs could show (which they cannot) that there is a genuine issue as to whether this denial of grant funding violated Plaintiffs' First Amendment rights, they still cannot show it was "clearly established" that ICDVVA's alleged action was unconstitutional. Therefore, each Defendant is entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, Defendants request that the Court grant their motion for summary judgment.

DATED: December 22, 2025.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

/s/ *Matthew L. Maurer*
MATTHEW L. MAURER
Deputy Attorney General
*Attorney for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 22, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Jeremiah Matthew Hudson
jeremiah@fisherhudson.com
service@gisherhudson.com

*Attorney for Plaintiffs*

/s/ *Matthew L. Maurer*
MATTHEW L. MAURER