UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO ANTI-TRAFFICKING COALITION and JENNIFER ZIELINSKI, <br><br> Plaintiffs, <br><br> v. <br><br> WES SOMERTON, JESSICA UHRIG, AMBER MOE, JENNIFER BEAZER, RACHEL KASCHMITTER, JONA JACOBSON, CLINT LEMIEUX, and DANA WIEMILLER, <br><br> Defendants. | Case No. 1:24-cv-00526-REP <br><br> **MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 62)** |

Before the Court is Defendants' Motion for Summary Judgment (Dkt. 62).  The matter is fully briefed, and the Court heard oral arguments on June 1, 2026.  The parties have consented to proceed before a United States Magistrate Judge (Dkt. 25).  For the reasons below, the Court finds that Defendants are entitled to qualified immunity.  Thus, Defendants' Motion will be granted.

## I.   BACKGROUND

### A.   Factual Background

This lawsuit involves grant funding for services to victims of human trafficking.  It concerns Defendants' decision to revoke an offer of grant funding to Plaintiffs for fiscal year 2025.

Plaintiff Idaho Anti-Trafficking Coalition ("IATC") is a nonprofit organization based in Boise that provides services to victims of human trafficking.  Sec. Amend. Compl. at ¶ 12 (Dkt. 54).  Primarily, IATC provides emergency services, including a 24/7 crisis hotline, emergency

1

housing, and necessities like food, clothing, and transportation.  Plaintiff Jennifer Zielinski is the Executive Director of IATC.  *Id.* at ¶ 13.

The eight named Defendants are (i) seven decision-making members of the Idaho Council on Domestic Violence and Victim Assistance ("ICDVVA"), and (ii) Dana Wiemiller, ICDVVA's executive director.  *Id.* at ¶¶ 14-20, 40.  ICDVVA is an Idaho state agency that serves as an "advisory body to fund, promote, and support programs and services affecting victims of domestic violence and other crimes in Idaho."  Defs.' SUF at ¶ 1 (Dkt. 62-1); *see also* Wiemiller Dec. at ¶ 3 (Dkt. 22-7).

ICDVVA receives funding from the federal government and distributes this funding to subrecipients within Idaho, which it selects through a grant application and approval process.  Sec. Amend. Compl. at ¶¶ 22-25 (Dkt. 54); Prelim. Inj. Hearing Tr. at 26:11-17 (Dkt. 55).  Victim services work involves multiple partners, and ICDVVA's funding standards generally require subrecipients to coordinate with other agencies, nonprofits, and community partners to promote and enhance victim services.  Maurer Dec. Ex. D at 16 (Dkt. 22-6).  IATC was a subrecipient of ICDVVA funding from 2019 until 2025, when its funding was revoked by Defendants.  Sec. Amend. Compl. at ¶ 22 (Dkt. 54).

Idaho Community Outreach Behavioral Services ("COBS") is another nonprofit organization based in Boise that provides services to victims of human trafficking.  In addition to crisis response, COBS provides longer-term safe housing, transportation, education, and case management for victims.  Beginning in 2023, COBS was a subrecipient of ICDVVA funding.  Paula Barthelmess was the Executive Director of COBS.

Ms. Zielinski and Ms. Barthelmess previously had worked together at IATC.  Ms. Barthelmess served as a contracted clinical supervisor for IATC's mental health clinic.  Zielinski

Dep. at 25:17-31:11 (Dkt. 62-5).  Ms. Zielinski terminated Ms. Barthelmess's contract in 2019, and Ms. Barthelmess then went on to lead COBS.  *Id.*  IATC and COBS served as the only two full-service anti-trafficking nonprofit organizations in the Treasure Valley.  *Id.* at 23:13-24:2.

From January 2020 onward, IATC and its employees, including Ms. Zielinski, repeatedly lodged complaints against COBS and Ms. Barthelmess to various government agencies and officials.  Sec. Amend. Compl. at ¶ 33 (Dkt. 54).  ICDVVA was one of the entities that received IATC's complaints about COBS.  *Id.* at ¶ 34.  Those complaints were wide-ranging and alleged, among other things, that COBS had required victims to do unpaid work, engaged in tax fraud, and had improper conflicts of interest.  *Id.* at ¶¶ 33-34.

In the spring of 2024, Zielinski shared her concerns about COBS with a regional nonprofit news organization called InvestigateWest.  Zielinski Dep. at 109:6 (Dkt. 62-5).  In response, InvestigateWest investigated victim services organizations within the Treasure Valley, most prominently COBS.  Zielinski "facilitated communications between victims and InvestigateWest reporters" and had "several conversations" with those reporters between March and November of 2024.  Zielinski Dec. at ¶¶ 3-4 (Dkt. 63-2).

ICDVVA also became a subject of InvestigateWest's reporting primarily because of its relationship to COBS.  InvestigateWest submitted a public records request to ICDVVA in the spring of 2024.  Sec. Amend. Compl. at ¶¶ 40-41 (Dkt. 54).  Subsequently, ICDVVA's members suspected that Zielinksi and IATC were the "driving force" behind the articles because the allegations in the articles were similar to those that Zielinski and IATC had previously made against COBS.  Defs.' SUF at ¶¶ 19-20 (Dkt. 62-1); Clark Dec. Ex. A (Dkt. 62-17).

Between July 15 and July 31, 2024, InvestigateWest published a series of four articles, endorsing many of the complaints that IATC and Zielinski had lodged against COBS.  Hudson

Dec. Exs. G-J (Dkts. 4-9, 4-10, 4-11, 4-12).  One of the four articles "expressed criticism" of ICDVVA for its role in funding COBS despite complaints from victims and from IATC.  Hudson Dec. Ex. H at 3-7 (Dkt. 4-10).  This article reported that Zielinski "believed" that nothing came of IATC's prior complaints because ICDVVA dismissed IATC's complaints as "part of an ongoing rift between two anti-trafficking organizations."  *Id.* at 5.

On July 26, 2024, ICDVVA met and approved grant funding for IATC for FY2025. Defs.' SUF at ¶ 36 (Dkt. 62-1).  On August 7, 2024, ICDVVA sent IATC a letter formally stating that it would award IATC a grant of $231,305 for fiscal year 2025 ("FY2025").  *Id.* at ¶ 37; Sec. Amend. Compl. at ¶ 81 (Dkt. 54).

The following day, InvestigateWest sent ICDVVA an additional public records request for all "[e]mails and text messages from April 23, 2024 to or from Dana Wiemiller until present day that contain these keywords: 'COBS' 'Paula' 'InvestigateWest' [or] 'Investigate West.'" Hudson Dec. Ex. AB (Dkt. 63-32).

Thereafter, ICDVVA initiated an investigation to "further scrutinize and monitor COBS." Wiemiller Dec. at ¶ 15 (Dkt. 22-7).  ICDVVA spoke with community partners "to confirm directly . . . that COBS was in fact successfully collaborating with them."  Defs.' SUF at ¶ 38 (Dkt. 62-1).  Amy Duque, an ICDVVA employee, interviewed eleven community partners with a list of prepared questions.  Hudson Dec. Ex. M (Dkt. 63-17).  She asked the same questions about both COBS and IATC.  *Id.*  In an email, Ms. Duque stated the purpose of the investigation was to help ICDVVA understand whether the "relationship between these two agencies has caused any impact or any disruptions to your work," so as to make "informed funding decisions . . . particularly in response to recent negative press."  *Id.*

On September 6, 2024, ICDVVA held a meeting to discuss whether ICDVVA should reconsider the FY2025 funding offers it had extended to COBS and IATC. Wiemiller Dec. at ¶ 23 (Dkt. 22-7). There, Ms. Duque reported the results of her interviews with community partners. Maurer Dec. Ex. E at 16:3-15 (Dkt. 62-8). However, the council did not take action on either funding decision at that time and placed both organizations' funding on the agenda for their next meeting. Wiemiller Dec. at ¶ 23 (Dkt. 22-7).

On September 20, 2024, ICDVVA held another meeting and voted to revoke IATC's FY2025 funding. *Id.* at ¶ 24. It sent IATC a letter memorializing this decision on September 25, 2024. Hudson Dec. Ex. Q (Dkt. 4-19). In it, ICDVVA stated that it had revoked IATC's funding due to its "concerns about IATC's refusal to collaborate with a variety of community partners, the resulting disruption to victim services, and the inadequate management/ administration of grant funds." *Id.* at 2. This suit followed.

B.      **Procedural History**

IATC filed its original Complaint on October 31, 2024. Therein, IATC asserted four claims: (i) Claim One: First Amendment retaliation by Defendants in their individual capacities, (ii) Claim Two: violation of due process by Defendants in their individual capacities, (iii) Claim Three: First Amendment retaliation by Defendants in their official capacities, and (iv) Claim Four: violation of due process by Defendants in their official capacities. Compl. at ¶¶ 108-32 (Dkt. 1). IATC moved for a preliminary injunction approximately two weeks later (Dkt. 4). Defendants moved to dismiss the Complaint, claiming that they were immune from suit, the Court lacked jurisdiction, and IATC failed to state a claim upon which relief could be granted (Dkt. 29).

On February 10, 2025, the Court issue an order granting in part Defendants' Motion to Dismiss, which (i) dismissed all claims against Defendant ICDVVA with prejudice due to sovereign immunity and terminated ICDVVA from the lawsuit, and (ii) precluded claims for damages from the individual defendants in their official capacities (Dkt. 34). The Court also allowed IATC to amend its Complaint. *Id.* at 5. IATC did so on February 14, 2025 (Dkt. 37).

On March 3, 2025, the Court denied IATC's motion for a preliminary injunction and dismissed Claim Three of IATC's Amended Complaint (Dkt. 41). Then, on April 14, 2025, the Court granted in part Defendants' Motion to Dismiss, dismissing Claims Two and Four of IATC's Amended Complaint and allowing Claim One of IATC's Amended Complaint to proceed to discovery (Dkt. 42).

On August 8, 2025, IATC moved unopposed for leave to file a Second Amended Complaint (Dkt. 51). IATC filed its operative Second Amended Complaint on August 13, 2025 (Dkt. 54). That Complaint added Ms. Zielinksi as a named Plaintiff.

Now before the Court is Defendants' Motion for Summary Judgment as to the remaining claim (Claim One) (Dkt. 62). Defendants argue that Plaintiffs cannot show a genuine dispute of material fact that they are entitled to relief on the merits of their First Amendment claim. *See* Defs.' Mem. ISO MSJ at 9 (Dkt. 62-1). Additionally, Defendants argue they are entitled to qualified immunity because they did not violate a clearly established right. *Id.* at 18.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's role at summary judgment is not "to weigh the evidence and determine the

6

truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted).

In considering a motion for summary judgment, courts must "view[] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, the court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.    First Amendment Retaliation: Employment Context**

In *Pickering v. Board of Education*, 391 U.S. 563 (1968), the Supreme Court articulated a balancing test for analyzing First Amendment retaliation claims in the employment context. That framework has since been applied to a range of First Amendment retaliation cases where "'the relationship between the parties is analogous to that between an employer and employee' and 'the rationale for balancing the government's interests in efficient performance of public services against public employees' speech rights applies.'" *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 720 (9th Cir. 2022) (quoting *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1101 (9th Cir. 2011)).

In its April 14, 2025 Order, the Court explained why the *Pickering* framework governs this case. *See* MDO on Defs.' MTD at 7-11 (Dkt. 42). The Court incorporates by reference and reiterates that conclusion here. *Pickering* applies to First Amendment retaliation claims brought by entities, like Plaintiffs, who contract with the government to provide services to the public – a relationship that is sufficiently analogous to an employer-employee relationship. *Id.* at 8.

7

Moreover, it applies where the government, as here, has a strong interest in ensuring those services are properly and effectively provided. *Id.* at 9.

*Pickering's* progeny makes clear that "'as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). Nevertheless, the government may restrain its employees' speech in ways that would be "unconstitutional if applied to the general public." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam). This is because the interest the government has when it regulates employee speech differs significantly from its interest in regulating the speech of the general public. *Pickering*, 391 U.S. at 568. When the government acts as an employer rather than a sovereign, it has an elevated interest in achieving its goals as effectively and efficiently as possible. *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 676 (1996) (citing *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion)). However, the government's power to restrict speech pursuant to this interest is not unbridled, and government employees (or contractors) cannot "constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering*, 391 U.S. at 568.

To make out a prima facie case of First Amendment retaliation under *Pickering*, a plaintiff must show that: "(1) [it] spoke on a matter of public concern; (2) [it] spoke as a private citizen rather than a public employee; and (3) the relevant speech was a substantial or motivating factor in the adverse employment action." *Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 904-905 (9th Cir. 2021) (cleaned up). If the plaintiff establishes these elements, "the burden then shifts to the government to show that (4) it had an adequate justification for treating [the

plaintiff] differently than other members of the general public; or (5) it would have taken the adverse. . . action even absent the protected speech." *Id.* (cleaned up).  In applying this burden-shifting analysis, courts must conduct "'a fact-sensitive and deferential weighing of the government's legitimate interests' as employer against the First Amendment rights of the employee." *Riley's*, 32 F.4th at 720 (9th Cir. 2022) (citation omitted).

"[P]romoting workplace efficiency and avoiding workplace disruption" are valid government interests that can justify speech restrictions.  *Hufford v. McEnaney*, 249 F.3d 1142, 1148 (9th Cir. 2001).  The government's burden in proving disruption "varies with the content of the speech." *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992).  Whether speech disrupted the workplace is fact-specific and depends on "the manner, time, and place in which the employee's speech took place." *Clairmont*, 632 F.3d at1107 (citation omitted).  Speech is disruptive only when there is an "'actual, material and substantial disruption,' or [there are] 'reasonable predictions of disruption' in the workplace." *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009) (citations omitted).  Disruption "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Nunez v. Davis*, 169 F.3d 1222, 1228 (9th Cir. 1999) (quoting *Rankin*, 483 U.S. 378, 388 (1987)).

On the other hand, speech that exposes wrongdoing or corruption lies at "the apex of the First Amendment" protections. *Moser*, 984 F.3d at 906.  Public employers "cannot be said to have a legitimate interest in silencing reports of corruption or potential illegality," even if those reports would disrupt harmony or efficiency in the workplace. *Hufford,* 249 F.3d at 1149.  Nor may they punish an employee for "legitimate whistleblowing." *Id.* at 1150. Accordingly,

9

employers must make a "'stronger showing' of disruption when the speech deal[s]. . . directly with issues of public concern." *Robinson*, 566 F.3d at 826 (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1115 (9th Cir. 1983)).

**C.      Qualified Immunity**

Qualified immunity shields government officials from liability for harm caused by reasonable mistakes, protecting all but the "plainly incompetent or those who knowingly violate the law." *Easley v. City of Riverside*, 890 F.3d 851, 856 (9th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The qualified immunity inquiry involves two steps.  "First, a court must decide whether a plaintiff has shown. . . a violation of a constitutional right. . ..  Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232.  Unless the answer to both questions is "yes," the defendant is entitled to immunity. *Id.*  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.  If the second prong is dispositive, courts need not analyze the first. *Id.* at 236-37.

When assessing qualified immunity on a motion for summary judgment, a court must view facts and inferences therefrom in the light most favorable to the nonmoving party. *See* Fed. R. Civ. P. 56(c).  However, "[Plaintiff], as the party seeking to deprive the defendants of qualified immunity, bears the burden of proving that the rights he claims were 'clearly

established' at the time they were allegedly violated." *Hufford*, 249 F.3d at 1149 (citing *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir.1998)).

A government official violates a clearly established right when, at the time of the challenged conduct, the contours of the right are sufficiently clear that every reasonable official would have understood that what they are doing violates that right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Existing precedent must have placed the statutory or constitutional question "beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 103 (2018).

Determining whether a right is "beyond debate" requires a fact-specific consideration of a plaintiff's claim. Relevant here, "the right to be free from First Amendment retaliation cannot be framed as the general right to be free from retaliation for one's speech"; the right must be defined at a more specific level tied to the factual and legal context of a given case. *Riley's*, 32 F.4th at 729 (internal citation omitted).

"Not surprisingly, there will rarely be a case that clearly establishes that the plaintiff is entitled to prevail under the fact-sensitive, context-specific balancing required by *Pickering*." *Riley's*, 32 F.4th at 729 (internal citation omitted); *see also Moran*, 147 F.3dat 847 (9th Cir. 1998) ("Because the underlying determination pursuant to *Pickering* whether a public employee's speech is constitutionally protected turns on a context-intensive, case-by-case balancing analysis, the law regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity.").

In assessing whether a right is "clearly established," courts must ask whether the outcome of the *Pickering* balancing test "so clearly favored" a plaintiff that it was "patently unreasonable" for a defendant to conclude that the First Amendment did not protect the speech in question. *Riley's*, 32 F.4th at 729. Whether the outcome of the *Pickering* test "so clearly favors" a plaintiff

11

depends on the two factors the *Pickering* test balances: the nature of a plaintiff's speech and the resulting disruption it caused. *See Hyland*, 972 F.2d at 1139 (explaining that the disruption a *Pickering* defendant must show varies with the kind of speech involved).

### III.    ANALYSIS

### A.    Plaintiff's First Amendment Claim

Claim One of Plaintiffs' Second Amended Complaint alleges that Ms. Zielinski engaged in constitutionally protected speech by communicating information about COBS's and Ms. Barthelmess's alleged improprieties to InvestigateWest. Sec. Amend. Compl. at ¶¶ 114-15 (Dkt. 54). It further alleges that Defendants retaliated against Plaintiffs for exercising their rights under the First Amendment by revoking IATC's FY25 grant. *Id.* at ¶ 113.

Defendants' Motion for Summary Judgment argues that Plaintiffs cannot show a genuine dispute of material fact that their First Amendment rights were violated when Defendants voted to deny them funding. *See generally* Defs.' Mem. ISO MSJ (Dkt. 62-1). First, Defendants argue that Plaintiffs cannot make out a prima facie case under *Pickering* because (i) Ms. Zielinksi did not engage in any expressive conduct on a matter of public concern, and (ii) even assuming she did, it played no role in the funding denial. *Id.* at 10-13. Next, Defendants argue that even if Plaintiffs can make out a prima facie case, they can meet their burden under *Pickering* to show the funding denial was justified for two reasons. First, Defendants argue the funding denial was justified because Plaintiffs' "highly inflammatory conduct" disrupted victim services. *Id.* at 1, 14-15. Second, Defendants argue they would have made the same decision regardless of Plaintiffs' expressive conduct, because Plaintiffs refused to collaborate and mismanaged their finances. *Id.* at 15-18.

Plaintiffs contest each of Defendants' arguments. *See generally* Pls.' Mem. In Opp. to MSJ (Dkt. 63). With respect to their prima facie case, Plaintiffs argue that Ms. Zielinski engaged in expressive conduct on a matter of public concern, and that this speech motivated Defendants' funding denial. *Id.* at 11-16. Further, Plaintiffs argue that Defendants' funding denial was not justified by legitimate countervailing interests because Ms. Zielinski's speech was legitimate whistleblowing and caused only the disruption inherent in exposing corruption. *Id.* at 16-18.

The parties' briefing capably addresses the merits of Plaintiffs' First Amendment claim. However, Defendants' Motion for Summary Judgment also asserts that they are entitled to qualified immunity. Defs.' Mem. ISO MSJ at 18 (Dkt. 62-1). In the interests of judicial economy, the Court has discretion to address qualified immunity before the merits of the First Amendment claim, and further, to address the second prong of the qualified immunity analysis – whether the right at issue is "clearly established" – first. *Pearson*, 555 U.S. at 236-237. Because the qualified immunity analysis – and the second prong thereof – is dispositive, the Court exercises that discretion here.

**B.    Qualified Immunity**

In determining whether the First Amendment right at issue here is "clearly established" under the second prong of the qualified immunity analysis, the Court first balances the nature of the Plaintiffs' speech and the resulting disruption and asks whether the outcome "so clearly favored" Plaintiffs. *Riley's*, 32 F.4th at 729. Then, the Court addresses whether Defendants' reaction to the Plaintiffs' speech was "patently unreasonable." *Id.*

Before doing so, the Court first discusses the current procedural posture and how it affects the inquiry. As explained above, the "right" subject to the qualified immunity analysis must be defined specifically, not generally. *See supra,* Section II.C. In its Order on Defendants'

Motion to Dismiss, the Court framed the qualified immunity inquiry as follows: whether it was clearly established that a "grant administering council (such as ICDVVA) violates the First Amendment if it denies grant funding to an organization (such as IATC) because the organization had communicated complaints to an investigative reporter that could reflect negatively on the council."  MDO on Defs.' MTD at 16 (Dkt. 42).  The Court framed the qualified immunity inquiry in this circumscribed way – referencing only the nature of Plaintiffs' speech and the alleged retaliation – because, at the motion to dismiss stage, it was confined to considering only those allegations contained within the complaint.  *Id.* at 17-18.  However, the Court foreshadowed that the frame would change at the summary judgment stage, after facts developed through discovery.  *Id.*  Thus, the Court now reframes the qualified immunity inquiry to also include facts concerning ICDVVA's interest's in preventing disruption to government services, the other half of the *Pickering* balancing.  *Riley's*, 32 F.4th at 725.

The Court now asks: considering the facts and inferences therefrom in the light most favorable to Plaintiffs – and recognizing that it is Plaintiffs' burden to disprove qualified immunity – whether it was "patently unreasonable" for Defendants to conclude that the First Amendment did not protect Plaintiffs' reports to a nonprofit news organization of anonymous and unverified allegations of fraud, conflict of interest, and wrongdoing by COBS and Ms. Barthelmess – previously reported to state and federal agencies which did not act upon them – that resulted in actual disruption to victim services.  *Riley's*, 32 F.4th at 729; *Hufford*, 249 F.3d at 1149.  For the reasons set forth below, the Court holds that it was not.

> 1.      ***Plaintiff's speech was not paradigmatic "legitimate whistleblowing"***

A government entity cannot punish a government contractor for legitimate whistleblowing, which "lies at the apex of the First Amendment['s]" protections.  *Hufford*, 249

14

F.3d at 1150; *Moser*, 984 F.3d at 906.  Strong protections extend to speech that addresses problems at government agencies, exposes illegal conduct or other wrongdoing by public officials, or otherwise reports "wastefulness, unethical conduct, violation of regulations, and incompetence" to supervisors or the public.  *Robinson*, 566 F.3d at 824 (citing *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 747-48 (9th Cir. 2009)).  In determining what weight to give a plaintiff's alleged whistleblowing, courts may consider, among other factors, whether the speech in question was "false or made with reckless disregard of the truth." *Gilbrook v. City of Westminster*, 177 F.3d 839, 868 (9th Cir. 1999), *as amended on denial of reh'g* (July 15, 1999) (citing *Moran v. Washington*, 147 F.3d 839, 849–50 (9th Cir. 1998)).

Here, construing the facts in the light most favorable to Plaintiffs and relying heavily upon Ms. Zielinski's own deposition testimony, the Court finds that Plaintiffs' communications to InvestigateWest were less than the paradigmatic "legitimate whistleblowing" entitled to the height of First Amendment protections.  Several aspects of the record compel this conclusion.

>        a.        *Defendants were not the primary subject of the whistleblowing*

First, Ms. Zielinski's alleged whistleblowing was not primarily directed at Defendants' alleged misconduct.  Instead, Ms. Zielinski's free speech to InvestigateWest complained about alleged wrongdoing by COBS and Ms. Barthelmess.  This attenuation must be considered in assessing Plaintiffs' claim of retaliation.

Ms. Zielinski's concerns with COBS arose out of her previous relationship with the head of COBS, Ms. Barthelmess.  In 2019, Ms. Zielinski terminated Barthelmess's contract as the clinical supervisor for IATC's mental health clinic.  Zielinski Dep. at 25:17-31:11 (Dkt. 62-5). The two did not maintain a relationship thereafter.  *Id.* at 54:5-9.

Starting in 2020, Ms. Zielinski began filing numerous complaints about Ms. Barthelmess and COBS with state and federal agencies and officials.  These included the Office of Civil Rights of the Department of Justice, Idaho Bureau of Occupational Licensing, and the Idaho Attorney General, among others.  Zielinski Dec. at ¶ 7 (Dkt. 4-25).[1]

In March 2023, Ms. Zielinski lodged a 41-page formal complaint about COBS with Defendants, but Defendants did not act on it.  So, Ms. Zielinski went to InvestigateWest with her concerns.  As it relates to Defendants, however, the articles only detailed that they failed to effectively supervise COBS, dismissed Ms. Zielinski's complaints about COBS, and did not discipline COBS.  *See* Hudson Dec. Ex. AL at 4 (Dkt. 63-42).  Accordingly, the articles did not implicate Defendants for their own misconduct.  *Id.*

That Plaintiffs' whistleblowing was directed at COBS's alleged misconduct, and not Defendants' misconduct, makes Plaintiffs' case for retaliation less compelling.  Namely, the link between Plaintiffs' free speech and Defendants' alleged retaliation is more attenuated.  Stated another way, because Defendants' own misconduct was not publicly exposed by Plaintiffs' free speech, Defendants had less incentive to retaliate in response to it.  Instead, Defendants' adverse action – the withdrawal of grant funding – was more likely motivated by the resulting disruption that Plaintiff's free speech caused.

### b.    The allegations were unverified

Second, the value of Plaintiffs' free speech is diminished by the fact that it was based on unverified allegations.  Namely, the sources of Ms. Zielinski's allegations to state and federal

---

[1] Zielinski's 2020 complaint to the Idaho Attorney General's Office also alleged misconduct by the Nampa Family Justice Center ("NFJC").  Zielinski Dec. at ¶ 8 (Dkt. 4-25). Some misconduct allegations against NFJC appeared in InvestigateWest's articles.  *See* Hudson Dec. Ex. AL at 9-10 (Dkt. 63-42).

agencies – and ultimately to InvestigateWest – were anonymous telephone calls for which corroboration was neither sought nor received.

The allegations that formed the basis of Plaintiffs' free speech to InvestigateWest were anonymously made.  Ms. Zielinski learned of these allegations against COBS from telephone calls that IATC received to its 24/7 crisis hotline from unidentified community parties, community members, or victims.  Zielinski Dep. at 53:9-54:1 (Dkt. 62-5).

There is no record evidence that Ms. Zielinski corroborated the allegations before making her complaints to state and federal agencies about COBS.  *Id.* at 79:9-13 ("Q. And just to be clear, these are allegations, by and large anonymous allegations, that you have no idea whether they are true or untrue? A. Correct."); 95:17-96:3 ("Q. So you have no knowledge of any of these allegations being substantiated. Is that a fair statement? A. Correct . . . Q. So they could all be false? A. They could be.").[2]  Thus, Zielinski did not know if these allegations were true or untrue when she made them.

Arguably, then, Ms. Zielinski made the allegations of wrongdoing against COBS and Ms. Barthelmess with "reckless disregard of the truth."  *Gilbrook*, 177 F.3d at 868.  While multiple, similar complaints may have given Ms. Zielinski some comfort that the allegations were true, failing to corroborate them in any meaningful way before publicizing them is not the type of legitimate whistleblowing that rises to the "apex" of the First Amendment's protections. *Hufford*, 249 F.3d at 1150; *Moser*, 984 F.3d at 906.

        c.    *The allegations previously had been communicated to state and federal agencies*

---

[2] As a basis for her claims that COBS was committing tax fraud by improperly soliciting donations, Ms. Zielinski referenced an online IRS record that showed that COBS tax-exempt status was revoked.  *See* Maurer Dec. Ex. A (Dkt. 62-4).  However, Ms. Zielinski's reliance was misplaced; COBS's tax-exempt status was auto-revoked, but reinstated the same day, so there was little basis for her claim.  *Id.*

Third, prior to publicizing the allegations against COBS and Ms. Barthelmess to InvestigateWest, Plaintiffs communicated them to state and federal agencies who failed to act upon them. Metaphorically, then, the "whistle had already been blown" on COBS and Ms. Barthelmess before the InvestigateWest articles. To some extent, this diminishes the value of Plaintiffs' free speech to InvestigateWest as whistleblowing that exposes wrongdoing.

In 2020, Ms. Zielinski filed a complaint with the Department of Justice's Office of Civil Rights. Her complaint alleged that Ms. Barthelmess locked Ms. Zielinski out of IATC electronic health records while Ms. Barthelmess worked as a clinical health supervisor contractor. Zielinski Dep. at 32:11-33:17 (Dkt. 62-5). The Office of Civil Rights did not take any action based on that complaint.

On February 7, 2022, Ms. Zielinski filed her first complaint with the Idaho Attorney General's Office, Medicaid Unit, alleging that COBS engaged in tax fraud for receiving donations after their 501(c)(3) non-profit tax exemption had been revoked. *Id.* at 38:24-40:21; Maurer Dec. Ex. G (Dkt. 62-10). The unit declined to investigate the complaint because investigating tax fraud was not part of its work. Zielinski Dep. at 46:15-18 (Dkt. 62-5). Zielinski then made a second complaint to the Attorney's Office that COBS had engaged in Medicaid fraud. *Id.* at 68:9-17. The Attorney General did not substantively respond. *Id.* at 68:18-69:1.

On September 29, 2022, Ms. Zielinski wrote Idaho State Senator Melissa Wintrow a letter alleging tax fraud, violations of victims' privacy rights, and conflict of interest by COBS. Maurer Dec. Ex. H (Dkt. 62-11). The alleged conflict of interest involved Ms. Barthelmess's work for a for-profit clinic owned by her son – Advanced Clinical Trauma Services (ACTS) – while simultaneously serving on the board of COBS, a tax-exempt nonprofit organization. *Id.* at

18

4.  Specifically, the complaint alleged COBS had solicited tax-exempt donations for its victim services, while also using ACTS staff to provide services for which ACTS billed Medicaid.  *Id.* at 11.  Senator Wintrow, who had previously worked with Zielinski on an Idaho Criminal Justice Commission subcommittee, did not respond to the letter.  Zielinski Dep. at 48:18-21; 63:25-64:1 (Dkt. 62-5).

Ms. Zielinski also complained to the Idaho State Tax Commission that COBS had committed tax fraud after its non-profit status was revoked.  *Id.* at 74:4-76:14.  She did not pursue it further and received no response.  *Id.* at 76:15-78:4.

In addition, Ms. Zielinski complained to the Idaho Bureau of Occupational License that, in 2020, Ms. Barthelmess had stolen IATC's National Provider Indicator (NPI) number, and that her son, Tyler Bell, had coopted it for use in his for-profit business, ACTS.  *Id.* at 80:29-81:6.  Ms. Zielinski met with an investigator from the Idaho Bureau of Occupational Licenses, but did not hear anything further from them.  *Id.* at 81:7-11.  Subsequently, ACTS was removed from IATC's NPI number.  *Id.* at 82:22-83:6.

Finally, on March 14, 2023, Zielinski filed the aforementioned 41-page formal complaint with ICDVVA, repeating the full panoply of alleged fraud and misconduct by COBS and Barthelmess.  Zielinski Dec. Ex. C (Dkt. 4-28).  The allegations therein included conflicts of interest involving COBS and ACTS, Medicaid fraud for concurrent billing by ACTS, violations of victims' privacy rights, requiring victims to perform unpaid work, and having untrained staff, among other allegations.  Wiemiller Dec. Ex. C (Dkt. 22-10).  ICDVVA discussed this complaint at a meeting on March 24, 2023, but declined to formally respond to it.  Zielinski Dec. at ¶ 10 (Dkt. 4-25); Zielinski Dec. Ex. E (Dkt. 36-1).

Thus, by the time Ms. Zielinski communicated these same concerns about COBS and Ms. Barthelmess to InvestigateWest, many of the state and federal agencies charged with investigating them had already received them and chosen not to act. Whether the agencies failed to act due to their lack of interest or diligence, or the unsubstantiated veracity of the claims, the fact remains that the allegations already had been publicized at the time of the subject free speech. Accordingly, Plaintiffs' free speech to InvestigateWest again falls short of paradigmatic whistleblowing entitled to the highest First Amendment protections.

> d.      *Plaintiffs' personal interests in the allegations undermine their veracity*

Fourth, Ms. Zielinski had a personal motivation – and IATC had a financial stake – in making the allegations against COBS and Ms. Barthelmess. These stakes further distinguish the free speech to InvestigateWest from pure whistleblowing.

From October 2023 (when ICDVVA made its first grant to COBS) forward, IATC and COBS were direct competitors for a shrinking pool of discretionary federal funding administered by ICDVVA. *See* Maurer Dec. Ex. E at Tr. 4:9-11 (Dkt. 62-8). In fact, they were the only two full-service anti-trafficking nonprofit organizations in the Treasure Valley. Zielinski Dep. at 23:13-24:2 (Dkt. 62-5).

As grantees, IATC and COBS were required to collaborate in the provision of victim services. For instance, the ICDVVA Service Standards has a section entitled "Interagency Collaboration" that provides that "[a]gencies must promote meaningful and respectful collaboration, coordination, and/or co-advocate with other agencies, other nonprofit organizations, and other community partners to promote and enhance victim services and to avoid duplication of effort." Maurer Dec. Ex. D at 16 (Dkt. 22-6); *see also* Maurer Dec. Ex. C (Dkt. 22-5) ("The Subgrantee must participate in and promote coordinated public and private

20

efforts to aid crime victims within the community served and collaborate with other victim service providers.").

Notwithstanding this charge, IATC and COBS failed to collaborate. This was in large part because of the personal feud between Ms. Zielinski and Ms. Barthelmess, largely driven by Ms. Zielinski. Indeed, in a February 28, 2023 email to Ms. Zielinski and Ms. Barthelmess, Heather Cunningham (a former director of ICDVVA) stated that "[t]he relationship between you both personally and between your organizations has been described to us as a 'blood feud' and 'getting out of hand'" and "the disputes between your non-profit programs are negatively impacting victim services in Idaho." Wiemiller Dec. Ex. A at 2 (Dkt. 22-8). Yet, when Ms. Cunningham offered mediation as a solution, Ms. Zielinski alone declined. *Id.* at 3. Instead, Ms. Zielikski soon after lodged the 41-page formal complaint with ICDVVA. This is telling.

That Ms. Zielinski refused mediation suggests that she viewed the dispute as personal and was less interested in resolving it than in total vindication. Should that vindication have occurred, and ICDVVA chosen to discontinue grants to COBS as a result, IATC potentially stood to gain financially as the only other full-service victims' services grantee in the Treasure Valley. Again, these motivations further call into question the veracity of Plaintiffs' allegations to InvestigateWest, and further distance them from good faith whistleblowing.

In sum, the full context of the speech at issue here is that it was unverified, had been previously publicized to government agencies and officials and not acted upon, and was motivated by personal animus and financial interest that affected its veracity. Accordingly, the Court concludes that its qualified immunity analysis should frame the speech in question as less than legitimate whistleblowing.

### 2.    *Plaintiff's speech caused actual disruption to victim services*

Next, the Court considers whether Plaintiffs' free speech caused actual, material and substantial disruption, or reasonable predictions of disruption, to ICDVVA's provision of victim services. *Robinson,* 566 F.3d at 824. As set forth below, the Court finds that Plaintiffs' speech caused actual disruption to victim services in the Treasure Valley, and thus, frustrated ICDVVA's mission.

The InvestigateWest articles were published between July 15 and July 31, 2024. After their publication, victim services in the Treasure Valley were disrupted. First and foremost, the articles created distrust, fear, and uncertainty amongst victims who resided at COBS's safe houses. ICDVVA council members discussed this issue at its September 9, 2024 special meeting:

> And, you know, I mean, that's the biggest fear that we heard from the [safe house victims] that COBS are working with during that, you know, meeting, was they're really afraid. You know, this whole -- this series of articles and everything else has really put them in fear for, you know, their future, really, is what they were talking about. That through the program they've been able to, you know, receive safe housing and assistance and get themselves, you know, on a much better trajectory, and they're really worried about that.

Maurer Dec. Ex. E at Tr. 48:15-49:1 (Dkt. 62-8); *see also* Cook Dec. at ¶ 9 (Dkt. 62-21) (articles "created confusion for vulnerable individuals seeking help and services, leaving victims not knowing whom to trust."). Finding anti-trafficking victims stable safe housing is a core part of ICDVVA's mission; the articles disrupted this pursuit by causing victims to question COBS's safe houses as an alternative.

Second, the articles disrupted collaboration between law enforcement and IATC and COBS. Often, in its investigations of human trafficking, law enforcement is the first to encounter victims. When they do, they rely on nonprofit anti-trafficking organizations, like

22

IATC and COBS, to assist the victims with immediate crises of lack of food, housing, and transportation; once stabilized at a safe house, law enforcement can later more easily access the victims as witnesses.

After the articles were published, law enforcement officers were confused about which organization they could trust. Vicki Gooch, the Co-Chair of the Treasure Valley Anti-Trafficking Task Force and Detective for Idaho State Police, averred:

> I am aware of InvestigateWest articles published in the summer of 2024 that were critical of COBS and Ms. Barthelmess, among others. The articles seemed to repeat many of the same attacks against COBS and Ms. Barthelmess that Ms. Zielinski had often used, which resulted in disruption to victim services. The articles caused a divide in the law enforcement community about who could be trusted and led to confusion and disarray.

Gooch Decl. at ¶ 5 (Dkt. 62-21).

Indeed, Ada County law enforcement was so disillusioned that it refused to work with *either* IATC or COBS. Again, ICDVVA council members discussed this issue at its September 9, 2024 special meeting:

> Ada County doesn't really want to work with either one of them because they're kind of tired of this -you know, this stuff. That there's, you know, disruption to community collaboration efforts and that, you know, ultimately this is all impacting victim services.
>
> * * *
>
> It's devastating to hear that Ada County chooses not . . . to participate with either organization. That's really scary . . . And the dysfunction, unfortunately, has now . . . impacted law enforcement where they won't work with them until the issue's done because they just can't deal with the drama.

Maurer Dec. Ex. E at Tr. 16:16-22; 34:18-36:16 (Dkt. 62-8).

*Id.* at 7, 12.  Law enforcement's reluctance or refusal to collaborate with IATC or COBS negatively impacted victims; after the articles, at least Ada County law enforcement officers (and perhaps others officers in the Treasure Valley Anti-Trafficking Task Force) did not refer them to either IATC or COBS who were most qualified to immediately address their emergent and longer-term needs.  Again, this undermined ICDVVA's mission.

Finally, the articles caused other victim services organizations to choose sides between IATC and COBS, further disrupting necessary collaboration in the victim services community. For instance, the Nampa Family Justice Center ("NFJC") rejected IATC.  In a September 19, 2024 letter to ICDVVA, Executive Director of the NFJC, Jeannie Strohmeyer, detailed instances where IATC had refused to collaborate with community partners.  Cook Dec. Ex. A (Dkt. 62-20).  Namely, the letter alleged that IATC refused funding support from the NFJC and refused to participate in a federally-funded Treasure Valley anti-trafficking task force.  *Id.* at 2.  The letter alleged that IATC's disparagement of COBS and Ms. Barthelmess "has caused confusion, disruption and distraction from the work [of providing victim services]."  *Id.*  Moreover, Taylor Cook, the Human Trafficking Task force manager for NFJC, attested that NFJC learned from victims that IATC would refuse to work with victims who had also worked with COBS.  Cook Dec. at ¶ 5 (Dkt. 62-19).  Cook reported that IATC's actions had fostered "a dynamic within the anti-trafficking space . . . that has created an "us" or "them" mentality."  *Id.* at ¶ 7.

This choosing of sides between IATC and COBS by other victim services organizations, and resulting disruption, was brought to a head by the spotlight the articles shone on their feud. According to Ms. Wiemiller, the articles "added to the disruption of victim services by making the feud between Ms. Zielinski and Ms. Barthelmess (and the organizations they represented) more public."  Wiemiller Dec. at ¶ 16 (Dkt. 22-7).  Due to the publication of the articles,

24

ICDVVA and its other subrecipients were caught in the middle of the dispute between IATC and COBS.  As Ms. Wiemiller explained, this "caus[ed] distraction and disruption as attention was directed toward this feud and away from the mission of assisting victims."  *Id.*

In sum, the Court concludes that, construed in the light most favorable to Plaintiffs, Plaintiffs' speech to InvestigateWest actually disrupted victim services and ICDVVA's mission. The articles publicized the feud between IATC and COBS, creating distrust in victims of COBS's safe housing; hesitation among law enforcement, who refused to work with either organization; and disarray among other victim service organizations, who were caught in the middle of the feud.

### 3. The right in question was not "clearly established"

On balance, then, Plaintiffs have not borne their burden of establishing that the *Pickering* balancing test "so clearly favored" them.  *Riley's*, 32 F.4th at 729.  As the above analysis makes clear, Plaintiffs' speech – documented in the InvestigateWest articles – was less than paradigmatic legitimate whistleblowing and therefore not the kind of speech that merits the apex of First Amendment protections.  *Moser*, 984 F.3d at 906.  Meanwhile, it resulted in significant actual disruption to the provision of victim services and ICDVVA's mission.  *Alpha Energy Savers*, 381 F.3d at 923.  Thus, it was not "patently unreasonable" for ICDVVA to conclude that Plaintiffs' speech was not protected by the First Amendment and to react by revoking IATC's FY 2025 grant.  *Riley's*, 32 F.4th at 729.  As such, Plaintiffs failed to demonstrate that their constitutional right to free speech in this context, and on these particular facts, was "clearly established."  *Pearson*, 555 U.S. at 232.

### 4. Plaintiffs provide no authority that places this constitutional question "beyond debate"

25

Nor do Plaintiffs provide any authority that otherwise favors their position and puts this constitutional question – on these specific facts – "beyond debate." *See Kisela*, 584 U.S. at 103. Plaintiffs primarily rely upon *Hufford* and cite it as this case's closest analogue. *See Hufford*, 249 F.3d at 1145-50. As set forth below, the facts of *Hufford* are readily distinguishable from the facts of this case.

In *Hufford*, the plaintiff – a firefighter – discovered that a cache of hardcore pornography, including pictures of children aged 7 to 9 years old, had been downloaded onto his fire station's computers. *Id.* at 1145. Hufford reported the cache to his station's chief. *Id.* The station chief then reported the matter to the local police chief (who was also his good friend). *Id.* A criminal investigation ensued, but ultimately was closed without any charges being brought. *Id.* at 1146. While the criminal investigation was ongoing, Hufford began to receive written reprimands and other complaints and was subsequently suspended and terminated. *Id.* at 1147. Hufford sued, and the defendants appealed the district court's denial of qualified immunity.

The Ninth Circuit upheld the district court's denial of qualified immunity. It found that defendants "should have been aware that discharging Hufford in retaliation for his truthful whistleblowing violated his constitutionally protected right to free speech." *Id.* at 1148. It further found that Hufford could "easily" establish that that "the interests served by allowing him to express himself about the downloading of pornographic material on the Department's computers outweighed the Department's interest in promoting workplace efficiency and avoiding workplace disruption." *Id.* at 1149. In doing so, the Court relied on two factors. *Id.*

The Ninth Circuit first observed that a defendant cannot rely on disruption which they initiated to outweigh a plaintiff's First Amendment rights. *Id.* The Court found that whatever disruption occurred was fueled by the threat of criminal charges, and it was the fire chief – not

26

Hufford – who reported the matter to the police. *Id.* Thus, the disruption was largely self-inflicted.

Next, the Ninth Circuit found that – in the *Pickering* calculus – defendants had no legitimate interest in "silencing reports of corruption or potential illegality." *Id.* at 1150. Thus, the kind of disruption caused by a whistleblower's exposure of corruption or illegality could not cause the kind of injury to a defendant's legitimate interests that outweighs a plaintiff's First Amendment rights under *Pickering*.

On both of these principles, the instant case is distinguishable. First, as set forth in detail above, Plaintiffs' speech fell far short of the paradigmatic whistleblowing at issue in *Hufford.* Mr. Hufford personally discovered the cache of pornography – including photographs of young children – and what he saw was an immediately verifiable violation of fire department regulations and likely a crime. Whereas Ms. Zielinski largely relied on anonymous and unverified reports of wrongdoing by COBS and Ms. Barthelmess, did not substantiate them, and admitted that they could be false. The alleged violations were not immediately apparent as criminal or even violative of law. Moreover, the alleged violations were the product of long-standing feud – in which Plaintiffs had a personal and perhaps financial stake in the outcome – that further undermined their veracity.

Second, unlike *Hufford,* Defendants here did not instigate or exacerbate the disruption. Whereas a defendant in *Hufford* (the fire chief) contacted the police and initiated the disruptive criminal investigation, Defendants did nothing to self-inflict the disruption here. Instead, the disruption to Defendants' operations was instigated by Ms. Zielinski's long-standing campaign against COBS and Ms. Barthelmess and exacerbated by Ms. Zielinski publicly airing her grievances in the media. And importantly, Defendants here – as the alleged retaliators – were

27

not the subject of Ms. Zielinski's reports of wrongdoing, like they were in *Hufford*. This attenuation further distinguishes the cases.

Thus, *Hufford* is not the analogue Plaintiffs say it is. On the particular facts at bar, it does not remotely put the constitutional question here "beyond debate." *See Kisela*, 584 U.S. at 103.[3] Accordingly, the Court finds that Defendants are entitled to qualified immunity on Claim One.

### 5.        *There is no basis for injunctive relief*

Plaintiffs' Second Amended Complaint contains prayers for compensatory damages, punitive damages, declaratory relief, and injunctive relief. Sec. Amend. Compl. at 35 (Dkt. 54). As it relates to injunctive relief, Plaintiffs pray for an injunction ordering Defendants to reinstate IATC's FY25 grant. *Id.*

As explained above, Defendants are entitled to qualified immunity. Qualified immunity shields government officials from monetary damages. *See Pearson*, 555 U.S. at 231. But it does not shield government officials from injunctive relief. *See id.* at 242-43 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 841, n. 5 (1998)). However, under *Ex Parte Young* and its progeny, only prospective equitable relief – to address an ongoing practice, policy, or procedure "that animates the constitutional violation at issue" – may be granted. *Az. Students' Ass'n v. Az.*

---

[3] The other case upon which Plaintiffs primarily rely – *Dodge v. Evergreen School District #114*, 56 F.4th 767 (9th Cir. 2022) – is even less helpful to them. That case involved political expression by a private individual – a teacher who wore a "MAGA" hat to teachers-only trainings – which the Ninth Circuit described as the "quintessential example of protected speech" protected by the First Amendment. *Id.* at 783. Balanced against this core political expression, the only disruption defendants could show was the offense that Plaintiff's fellow teachers took in viewing the hat at the trainings; Defendant presented "no evidence of actual or tangible disruption to school operations has been presented." *Id.* Thus, the Ninth Circuit found that these particularized facts presented the "rare occasion[]" where application of the *Pickering* balancing test was clear enough to deny qualified immunity. *Id.* The instant case is much different. As set forth above, here, Plaintiffs' speech here was neither political speech expressed by a private citizen nor legitimate whistleblowing. And it resulted in actual disruption to victim services and ICDVVA's mission. Accordingly, *Dodge* is inapposite.

*Bd. of Regents*, 824 F.3d at 858, 865 (9th Cir. 2016) (citing *Ex Parte Young*, 209 U.S. 123, 149-56 (1908)).

As the Court found in its March 3, 2025 Order, this case involves a single exercise of discretion by Defendants in revoking Plaintiffs' FY25 grant, not an ongoing practice, policy or procedure. *See* MDO on Pls.' Mtn. for Prel. Injunction and Defs.' Mtn to Dismiss at 8-13 (Dkt. 41). Notwithstanding the Court's invitation to Plaintiffs to amend their complaint if they developed evidence of a policy, practice, or procedure, *id.* at 22, the Plaintiffs did not make any substantive changes to their complaint (beyond adding Ms. Zielinski as a named Plaintiff).[4] Accordingly, there is no genuine dispute of material fact that Plaintiffs are entitled to prospective injunctive relief. Claim One will be dismissed its entirety.

### IV.   CONCLUSION

The Court orders as follows:

1. Defendants' Motion for Summary Judgment (Dkt. 62) is GRANTED.

   a. Claim One is dismissed with prejudice.

2. Judgment for Defendants shall be entered separately.

SO ORDERED.



DATED: July 20, 2026

Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge

---

[4] In their unopposed motion to amend their complaint, Plaintiffs stated that they did not "add any facts or causes of action" to their complaint. Mem. ISO Unopposed Mot. to Amend at 2 (Dkt. 51-1).